HERBERT HILTON ET AL. *v.* CITY OF
NEW HAVEN ET AL.
(14925)

PETERS, C. J., and CALLAHAN, BORDEN, BERDON, NORCOTT, KATZ and PALMER, Js.

*(One justice concurring separately, two justices dissenting)*
Argued June 9 and September 20, 1994—decision released June 20, 1995

*Martin S. Echter*, deputy corporation counsel, with whom, on the brief, was *Aileen M. Bell*, deputy corporation counsel, for the appellants-appellees (defendants).

*Amy Eppler-Epstein*, with whom, on the brief, was *Shelley A. White*, for the appellees-appellants (plaintiffs).

*Richard Blumenthal*, attorney general, with whom were *Jennifer C. Jaff*, assistant attorney general, and, on the brief, *Richard J. Lynch* and *Hugh Barber*, assistant attorneys general, for the state of Connecticut as amicus curiae.

*Mary-Michelle U. Hirschoff,* for the Connecticut Conference on Municipalities as amicus curiae.

*Sheila Huddleston,* with whom, on the brief, was *Peter W. Benner,* for the Coalition to End Homelessness et al. as amici curiae.

NORCOTT, J. The principal issue in this appeal is whether the named defendant, the city of New Haven,[1] has an obligation to provide indigent individuals with shelter pursuant to article first, § 10, of the Connecticut constitution or as an unenumerated right implicit in the state constitution. The plaintiffs, a certified class of homeless persons from New Haven,[2] claim that New Haven has abrogated its constitutional duty by limiting the provision of emergency shelter pursuant to No. 92-16 of the Public Acts, Special Session, May, 1992 (Spec. Sess. P.A. 92-16), incorporated in General Statutes (Rev. to 1993) § 17-273d.[3] We reject the plaintiffs' claim.

---

[1] Also named as defendants in this action are Biagio Dilieto, the former mayor of the city of New Haven, and William Lee, the former director of the department of welfare for the city of New Haven, both in their official capacities. We refer herein to all the defendants collectively as New Haven.

[2] The trial court certified the class as "all individuals in the City of New Haven who are now or in the future will become homeless, i.e., without a place to live on a temporary or permanent basis, and who request emergency shelter." Originally, the named plaintiffs were Herbert Hilton, Steven McEwen, Bobby Walker, Star Williams, Deidre Colburn and Janet Cardin. In May, 1993, the parties entered into a stipulation agreement that allowed Thomas Baines and Georgianna Valtorta to join the plaintiff class.

[3] General Statutes (Rev. to 1993) § 17-273d, now § 17b-120, provides: "EMERGENCY SHELTER SERVICES FOR GENERAL ASSISTANCE RECIPIENTS. (a) Any town may contract with a nonprofit organization to provide emergency shelter services for general assistance recipients. Without the authorization of the commissioner of income maintenance, emergency shelter services for a general assistance recipient shall not exceed fifty-six nights of residence per calendar year. Payments by towns for such services may be made on a quarterly lump sum basis and expenditures for such payments shall be deemed to be a cost reimbursable under section 17-292, *except that no town shall be liable to pay for emergency shelter services for recipients who fail to verify their efforts to secure permanent housing. Emergency shelter*

The relevant factual and procedural background is as follows. In 1989, when this action was initiated, New Haven was operating three emergency shelter facilities[4] for homeless men.[5] These shelters were: (1) the Columbus House, which had thirty-eight beds year-round and ten additional beds in the winter; (2) the Cedar Street Annex, with a capacity of fifty beds year-

services shall be provided only to those recipients who cannot remain in permanent housing because (1) a judgment has been entered against the recipient in a summary process action instituted pursuant to chapter 832, provided the action was not based on criminal activity, or a judgment has been entered against the recipient in a foreclosure action pursuant to chapter 846 and the time limited for redemption has passed; (2) the recipient has left to escape domestic violence; (3) a catastrophic event, such as a fire or flood, has made the permanent housing uninhabitable or the recipient has been ordered to vacate the housing by a local code enforcement official; (4) the recipient shares an apartment with a primary tenant who is being evicted or is engaged in criminal activity; (5) the recipient was illegally locked out by a landlord and has filed a police complaint concerning such lockout; or (6) the recipient has been living with a tenant who received a preliminary notice under section 47a-15 or a notice to quit because of termination of a rental agreement for lapse of time.

"(b) The commissioner of income maintenance shall adopt regulations in accordance with chapter 54 establishing requirements for documentation of such expenditures and shall adopt regulations in accordance with said chapter establishing the maximum reimbursable rate of payment for such services." (Emphasis indicates language added by Spec. Sess. P.A. 92-16, § 7.)

[4] Each municipality in the state of Connecticut is required to adopt and file a town plan specifying how it will meet the emergency housing and nutritional needs of its citizens. Connecticut State Department of Income Maintenance General Assistance Policy Manual (1993) § 17-3a-31 (entitled "Emergency Shelter Services"). Municipalities are eligible for reimbursement from the state for 80 percent of the funds expended in providing shelter; 20 percent of the costs, as well as administrative costs, are to be borne by the municipality. See General Statutes (Rev. to 1993) § 17-292 (b), as amended by No. 93-418, § 11, of the 1993 Public Acts, now § 17b-134 (b).

[5] Although the plaintiff class includes both men and women, the plaintiffs' briefs focus only on the adequacy of shelter being provided by New Haven to single adult men. For reasons of clarity, we limit our discussion to single adult men's shelter facilities. Because the case as argued to the trial court addresses the broader range of persons in need of emergency shelter, however, our analysis and conclusions are applicable to women, children and families as well.

round; and (3) an "overflow" shelter located at the Albie Booth Boys' Club, which was open only in the winter, with a capacity of seventy-five beds.[6] All three of these shelters were operated by Columbus House, which was the city's contractor for shelter services. The policy of all three shelters was to admit persons nightly on a first come, first served basis until all shelter beds were filled. Once a shelter was full, additional persons were turned away. Recipients were not screened for general assistance eligibility, nor were they asked to explain the circumstances surrounding their homelessness.

In March, 1989, New Haven announced that it planned to close the winter overflow shelter as of April 1, 1989. This date was subsequently extended to April 30, 1989. In response, the plaintiffs instituted an action seeking temporary and permanent injunctive relief prohibiting New Haven from closing the overflow shelter and ordering New Haven to make available shelter for all persons seeking shelter. In their complaint, the plaintiffs alleged that New Haven was failing to provide shelter for all persons seeking shelter and that the closure of the overflow shelter would exacerbate the situation. The plaintiffs further alleged that New Haven's failure to make shelter available to all needy individuals violated General Statutes (Rev. to 1989) § 17-273[7] and the state and federal constitutions. The trial court ordered the defendants to appear and show cause why a temporary injunction should not be granted.

At the show cause hearing held on April 26, 1989, Cynthia DeLouise, director of the Columbus House shelter, testified that the shelters consistently had been

---

[6] The winter overflow facility was opened in the winter of 1988–89 in response to a commitment by the then mayor to have an open door policy for those seeking shelter during the winter months.

[7] For the text of the subsequent amendment to § 17-273, see footnote 14.

filled to capacity and that they had had to turn people away.[8] In addition, several homeless individuals[9] testified that they had been turned away from New Haven's shelters because the shelters had been full, and that they had spent one or more nights on the streets, in parks or in abandoned buildings.[10] They also testified about the difficulty of obtaining and maintaining

[8] DeLouise testified that all three facilities managed by Columbus House have been filled to capacity and that "[o]n any given evening we can turn up to fifteen individuals away" because they lacked the bed space, although she was not sure if this count was accurate because there could be overlap in the individuals that were turned away. In addition, DeLouise testified that the city had been using hotel rooms to accommodate the overflow, but that this program was stopped at the end of March due to financial constraints.

[9] In addition to the named plaintiffs: Hilton, Cardin, Colburn, McEwen and Walker; Thomas Sawyer, Edward Newell and Alvin Brown, all of whom are homeless, testified for the plaintiffs. Also testifying for the plaintiffs were Brother Denys Cormier, executive director of the Downtown Evening Soup Kitchen, and Renee Boyd, a case worker at the Homeless Health Project of the Hill Health Center.

[10] Hilton, Cardin, Walker, Sawyer and Newell testified that they had been turned away from the city's shelters because they were full. Hilton testified that he had been turned away from a shelter on a snowy night, and that he had spent the night in an abandoned building, where he made a fire and covered himself with rugs to keep warm. Cardin testified that she had been denied shelter on a number of summer nights because she had arrived too late and the fact that she had been working, and therefore had had to sleep on the New Haven Green. Walker testified that he had been turned away from a shelter and had slept in basements, abandoned buildings and old cars. Sawyer testified that when he could not get admitted to a shelter, he slept at a friend's home, at the boys' club or in vacant buildings. Newell testified that he had been turned away from a shelter once, and had spent the night at the boys' club.

Testimony was also heard regarding what life was like living on the streets. Hilton testified that anything could happen to a homeless person, including getting killed. Cardin testified that she was harassed by passersby and had been propositioned because they thought she was a prostitute. Brother Denys testified that it is difficult to survive when you are cold, hungry and wet and that many people sleep at the soup kitchen during the day because they are afraid to sleep outside at night. DeLouise stated: "[M]y fear is that many individuals will, could die on the streets [or] will be hurt on the streets . . . . I know . . . that people have been hurt in abandoned buildings. We've had women raped in abandoned buildings."

a job while living at a shelter[11] and of the shortage of affordable housing in the New Haven area.[12] Both shelter workers and homeless individuals testified that, if the overflow shelter were closed, even more individuals would be forced to live on the streets. There was also testimony regarding the increased number of health and mental problems among the homeless.[13]

The plaintiffs also called as a witness Christopher Collier, a historian and author of numerous articles on the constitutional and legal history of Connecticut, who testified that Connecticut's municipalities have had a long tradition of supporting the poor. In addition, Col-

---

[11] Cardin and Sawyer testified that it was difficult to hold down a job and also get back to the shelter early enough to ensure that you got a bed. Sawyer stated that he would have to stop working if the overflow shelter was closed. Boyd and DeLouise also testified that if the city closed the overflow shelter, working people would suffer because they would not be able to get in line early enough. In addition, Sawyer testified that he could not work the days following the nights he slept on the street because it was impossible to "put in a good day's work if you haven't slept or eaten." He also stated that without the facilities available at the shelter, he could not adequately clean himself or his clothes to appear at work in a presentable manner. Colburn testified that in order to get clean after spending the night on the New Haven Green, she had to take sponge baths in the hospital bathroom because she had nowhere else to bathe.

[12] Brother Denys testified that many homeless persons face prejudice from prospective landlords because they live in shelters and are presumed to have drug or alcohol problems or mental disorders. Judith Walter of the state department of human resources testified that there was a severe shortage of housing in the state.

This testimony was rebutted by Michael Randi, operations manager for the city's welfare department, who testified that a recent survey of available housing units conducted by the city found thirty-three units available, offered by landlords who had in the past rented to general assistance recipients.

[13] Boyd testified that, in the homeless population, there is a greater incidence of and need for treatment of skin diseases, wounds, blisters, asthma, bronchitis, pneumonia, colds, fevers, muscular diseases, and mental disorders such as chronic psychosis, alcoholism and cocaine abuse. Boyd also testified that in her opinion, if the overflow shelter closed, a larger number of people would become ill. Colburn testified that as a result of her homelessness she had lost weight and was depressed.

lier gave his opinion that, based upon the philosophical and historical underpinnings of the Connecticut constitution, the framers of the 1818 constitution intended to incorporate in the constitution the governmental obligation to provide all homeless individuals with shelter.

The trial court granted the plaintiffs' motion for a permanent injunction. In its decision, the court made the following findings of fact. "Since 1987, because of an increasing number of persons were being turned away from Columbus House and the Annex, the city has operated various 'winter overflow programs.' These programs were terminated when warmer spring weather arrived. . . .

"Between January, 1989, and the time this lawsuit was filed in April, 1989, Columbus House, the Annex, and the winter overflow facility were filled to capacity every night and persons seeking emergency shelter, on occasion, were turned away. After the motel room beds at City motels were terminated on March 31, 1989, Columbus House, Inc., was turning away upwards of 15 persons each night when shelter beds at Columbus House, the Annex and the Albie Booth overflow facility were filled to capacity.

\* \* \*

"[Absent the] relief requested, there would be no overflow shelters and presumably those persons now occupying beds . . . would be facing outside temperatures expected to approach 10 to 15 degrees on the night this portion of the decision is written.

\* \* \*

"The plaintiffs and the other members of the class would be irreparably harmed if the relief requested were not granted. Absent this court's . . . order, they would be obliged to cope with the elements—rain, snow,

wind and freezing temperatures." *Hilton* v. *New Haven*, Superior Court, judicial district of New Haven, Housing Session, Docket No. 8904-3165 (December 27, 1989).

On the basis of these findings, the court then concluded that New Haven's practice of turning away needy individuals when a shelter was full violated General Statutes (Rev. to 1989) § 17-273. The court explained that § 17-273 required that "[e]ach person who has not estate sufficient for his support . . . be provided for and supported at the expense of the town in which he resides . . . ." The court further explained that one element of the municipalities' statutory obligation to ensure that its needy were provided for and supported was the duty to provide its needy with emergency shelter. The court therefore ordered New Haven to keep the overflow shelter open and to provide shelter services to anyone claiming to be in need. The court also ordered New Haven to submit within thirty days a plan implementing the dictates of the injunction. Finally, the court determined that, because the legislature had spoken directly on the issue, "the court need not address the constitutional challenges raised by the plaintiffs and will refrain from doing so." *Hilton* v. *New Haven*, supra, Superior Court, Docket No. 8904-3165.

New Haven appealed from the trial court's 1989 order. We dismissed that appeal for lack of a final judgment. Over the next two and one-half years, despite numerous proposals, New Haven failed to devise a compliance plan that met with the trial court's approval. Nevertheless, during that period of time, the Cedar Street Annex shelter was closed, and the Emanuel Baptist Church replaced the Columbus House as New Haven's contractor for men's shelter services. Thereafter, New Haven sponsored only two shelters for single adult men: a seventy-five bed facility on Crown Street, and a fifty bed overflow facility on Grand Avenue. The Columbus House facility continued to be oper-

ated by Columbus House as a private nonprofit free shelter, with thirty-eight beds available for men.

In 1992, the legislature enacted Spec. Sess. P.A. 92-16, substantially revising § 17-273,[14] and further

[14] General Statutes (Rev. to 1993) § 17-273, which incorporated Spec. Sess. P.A. 92-16, now § 17b-116, provides in relevant part: "LIABILITY OF TOWN FOR SUPPORT. REGULATIONS. (a) Each person who has not estate sufficient for his support, and has no relatives of sufficient ability who are obliged by law to support him, shall be provided for and supported *to the extent required under the provisions of this chapter and section 17-3a* at the expense of the town in which he resides, except as otherwise provided in this section, or, if he has no residence, of the town in which he becomes in need of aid, subject to the provisions of section 17-273b, subsection (a) of section 17-281a, and in accordance with section 17-292g except that in making a determination of liability for support under this section the income of a stepparent living in the same home as a dependent child or dependent children shall be considered in the same manner and to the same extent as under the aid to families with dependent children program pursuant to section 17-85. . . . A person who is a recipient of financial aid under chapter 302 *or of social security disability or supplemental security income* shall be considered to be provided for by the state [, pursuant to section 17-292a] *or federal government.* On and after September 4, 1991, no such person shall be eligible to receive general assistance financial or medical aid. No town shall be liable to supplement a recipient of financial aid under chapter 302 whose award has been reduced or suspended[,] or who has been penalized with a period of ineligibility, during such period of ineligibility. A person who is a recipient of medical aid under chapter 302 shall be considered to have his medical needs provided for by the state and no such person shall be eligible to receive general assistance medical aid.

"(b) On and after April 1, 1984, no town shall refuse to accept an application for general assistance or general assistance medical benefits because a person is deemed not to be a resident. In such a case, the town shall accept the application and contact the department of income maintenance. The department shall arrange to have the application transferred to the appropriate town of residence. If a dispute arises between two towns as to liability for support, the dispute shall be referred to the commissioner of income maintenance in accordance with the provisions of section 17-292.

"(c) Except as provided in sections 17-280 and 17-281, a person whose assets exceed two hundred fifty dollars shall not be eligible for assistance pursuant to this section or section 17-274. The commissioner of income maintenance may adopt regulations, in accordance with chapter 54, to implement the provisions of this subsection. . . .

"*(e) Only persons domiciled and residing in Connecticut or who have no other residence, and who are United States citizens or who have been admitted*

amending, in material respects, General Statutes §§ 17-273b[15] and 17-273d. See footnote 3 for the text of § 17-273d as amended. The amended statutory scheme narrowed the class of persons for whom the

*as residents into the United States shall be eligible for support under the general assistance program.*

*"(f) No person who is a substance abuser and refuses or fails to enter available treatment shall be eligible for financial assistance under the general assistance program until such person enters treatment.*

*"(g) A town may provide assistance additional to that required under the provisions of this chapter. No such additional assistance shall be considered income in determining whether a person is eligible for assistance under this chapter. Any such additional assistance shall be paid by the town without any reimbursement from the state. Each town which offers such additional assistance shall notify the commissioner of the assistance to be provided and the eligibility criteria for such assistance."* (Emphasis indicates language added by Spec. Sess. P.A. 92-16, § 5; brackets indicate language deleted by that section of that act.)

[15] General Statutes (Rev. to 1993) § 17-273b, now § 17b-118, provides in relevant part: "LIMITATIONS ON ASSISTANCE TO EMPLOYABLE PERSONS. REGULATIONS. No assistance or care shall be given under this part to an employable person who has not registered with the nearest local employment agency of the labor department, has refused to accept a position for which he is fitted and which he is able to accept, or has refused to participate or wilfully failed to report for work in a work program or training or education program, pursuant to section 17-281a, by the town liable to support such person in accordance with sections 17-273 and 17-292. The provisions of this section shall not apply to any person who cannot register with such employment agency because of being over sixty-five years of age, health or other disability *as determined by the commissioner. On and after July 1, 1992, financial assistance granted under this chapter to an employable person shall be limited to no more than nine months in a twelve-month period. A town may extend the period during which assistance is granted by up to three months for recipients who are in compliance with program requirements. A person determined to be unemployable who is subsequently determined to be employable shall be eligible for the assistance provided to an employable person under the general assistance program from the date he is determined employable. Persons with dependent children under eighteen years of age eligible for assistance under this chapter and ineligible for assistance under chapter 302 shall not be subject to the nine-month durational limit on assistance established pursuant to this section. The commissioner of income maintenance shall adopt regulations, in accordance with the provisions of chapter 54, to implement the provisions of this section."* (Emphasis indicates language added by Spec. Sess. P.A. 92-16, § 6.)

municipalities were statutorily obligated to provide emergency shelter and all other forms of support. The revised statute first provides that a municipality is required to ensure that its needy are "provided for and supported" only "to the extent required under the [specific] provisions of" the general assistance program. Spec. Sess. P.A. 92-16, § 5; see General Statutes (Rev. to 1993) § 17-273. The revised statute further provides that a municipality is required to provide emergency shelter only to those individuals enrolled in and receiving benefits from the general assistance program who are unable to remain in permanent housing as a result of one of six enumerated reasons. Spec. Sess. P.A. 92-16, § 7; General Statutes (Rev. to 1993) § 17-273d; see footnote 3. Finally, the revised statute provides that employable individuals can participate in the general assistance program for only nine months in a twelve month period, so that, during the final three months, employable individuals are ineligible to receive state funded emergency shelter. See General Statutes (Rev. to 1993) § 17-273b; *Moore* v. *Ganim*, 233 Conn. 557, 562–65, 660 A.2d 742 (1995). Special Session P.A. 92-16 became effective on July 1, 1992.

In July, 1992, relying upon the statutory revision, New Haven moved in the trial court for reconsideration of the court's 1989 order. The plaintiffs objected to reconsideration on two grounds. First, they argued that Spec. Sess. P.A. 92-16 violated the plaintiffs' fundamental right to shelter, a right that they claimed had been afforded to them by the state constitution. Second, they argued that, even if Spec. Sess. P.A. 92-16 was valid, the court's 1989 order remained necessary, because New Haven still had not guaranteed to provide shelter beds for individuals eligible for shelter under the new statute. No additional testimony was offered in connection with the motion to reconsider or the plaintiffs' objections to that motion.

In November, 1992, the trial court concluded that, although the statutory amendments substantially had limited New Haven's obligation to provide emergency shelter, the amendments had not invalidated the court's earlier decision because New Haven's policy of first come, first served still did not guarantee that shelter would be available to all general assistance recipients who met the new eligibility criteria. *Hilton* v. *New Haven*, supra, Superior Court, Docket No. 8904-3165 (motion for reconsideration, November 16, 1992). Thus, New Haven remained obligated to create a compliance plan to fit the new statutory provisions. The trial court, however, rejected the plaintiffs' arguments regarding the existence of a right to shelter under the state constitution, concluding that there was neither a common law duty nor an implicit right in the Connecticut constitution that obligated the government to provide shelter to every indigent person. The court did not issue any findings of fact as to the number of needy individuals who would be unable to secure shelter as a result of the new statutory scheme or as to the circumstances faced by such individuals.

On April 1, 1993, New Haven submitted a modified plan of compliance to the court, in which it agreed to provide shelter to all individuals eligible for such shelter under General Statutes (Rev. to 1993) §§ 17-273, 17-273b and 17-273d. Simultaneously, New Haven announced that it was considering closing the Grand Avenue overflow shelter upon approval of the compliance plan. The plaintiffs filed objections to the city's modified compliance plan and a motion for a temporary injunction to prohibit New Haven from closing the overflow shelter or from otherwise reducing the number of beds available in the city shelters. The plaintiffs also filed an application for a stay pending their appeal of the trial court's decision of November, 1992, which had held that there was no constitutional right to shelter.

On April 15, 1993, the court granted the plaintiffs' motion for an ex parte temporary injunction and ordered New Haven to appear before the court and show cause why the plaintiffs' other requested relief should not be granted.

At the show cause hearing held on April 20, 1993, the plaintiffs presented the testimony of six homeless men, the first five of whom were living in city funded shelters, and the last of whom was living at Columbus House, a privately funded shelter. The first three of these men were recipients of general assistance and, as the state conceded, continued to be eligible for shelter under the provisions of General Statutes (Rev. to 1993) § 17-273d.[16] The other three men were not receiving general assistance, and thus, presumably, would not be eligible for shelter under § 17-273d or New Haven's compliance plan. The three men not receiving general assistance testified that their circumstances were as follows.

Thomas Baines had been living in the city run shelter since his release from prison in February, 1993. Baines had applied for general assistance, but had been denied benefits on the grounds of "inadequate documentation."[17] He had not yet requested a fair hearing

[16] Darrell Sheeley testified that before he came to the city run shelter, he had been living with his mother and siblings, but his mother had asked him to leave the house because of a "domestic violence situation." It was unclear whether Sheeley was the perpetrator or the victim of this violence. Thomas Januska and Carlos Cabral testified that before they came to the city run shelter, they had been living in private rooming houses and that they had been evicted when the general assistance grant levels decreased and they no longer were able to afford the rent. The state conceded that, with appropriate documentation, all three individuals would qualify for continued emergency shelter under General Statutes (Rev. to 1993) § 17-273d (a) (1) and (2). Januska and Cabral already had provided such documentation, and all the parties assumed that Sheeley could get the necessary documentation upon request to the police department.

[17] Specifically, Baines' prison release record contained a typographical error, so that his name had been misspelled as "Barns".

to review the denial, although he was planning to meet with legal services attorneys about the possibility of requesting such a hearing. Baines was unable to secure a job because of his four felony convictions, and he had nowhere else to live. If he was not able to live in the city shelter, he predicted that he would be forced to return to his former life of selling drugs and living in abandoned buildings, cars or the graveyard. He previously had camped in the last location for approximately four months.

Robert Klopp had been living in city run shelters since July, 1992, when he became unable to pay his weekly rent at the Hotel Duncan. Before leaving the Hotel Duncan, Klopp had applied for general assistance, but his application had been denied because he refused: (1) to allow New Haven to consider as income benefits he was receiving from the Veterans Administration; and (2) to assign to the state his interest in a potential judgment against his former employer. Klopp had appealed the denial of benefits to a city fair hearing officer, to a state fair hearing officer and to the Superior Court, but the denial had been affirmed at each level. At the time of the show cause hearing, his appeal of the denial of benefits was pending before the Appellate Court. Klopp testified that he had nowhere else to live. If he was excluded from the city run shelter, Klopp predicted that he would stay in the lobby of the police station, "[b]ecause I refuse to sleep on the [G]reen or in some other place where I would be in jeopardy." Klopp refused, however, to reapply for general assistance if it meant abandoning his previous objections.

Charles Beedy had been living in Columbus House, a privately funded shelter, although he did not testify as to the length of time that he had been staying there. Beedy had received general assistance in the past, but his benefits had been discontinued when he had obtained employment. He subsequently had been fired

from that job for cause. Thereafter, he reapplied for general assistance, but was notified that he would be ineligible to receive benefits for ninety days because he had been terminated from his job for cause. Beedy went to Columbus House because he had had nowhere else to live. To retain his privilege of living in Columbus House, he was required actively to seek new employment. If he were excluded from Columbus House and the other city funded shelters, he predicted that he "would have to do the best way that I could do . . . and that might be going to abandoned houses like I have done before or sleep in a car or sleep in the park."

New Haven then called as a witness Carmen Rodriguez, the city's coordinator for the homeless. Rodriguez testified that an informal survey was taken on April 9, 1993, in the New Haven shelters that revealed that only thirty-seven of seventy-nine shelter residents were receiving general assistance. Of the thirty-seven residents receiving general assistance, only two had documentation with them at the time of the survey proving that they had lost their permanent housing for one of the six statutorily enumerated reasons. Rodriguez also testified that New Haven had encouraged all the shelter residents receiving general assistance to secure adequate documentation and that it further had encouraged all the shelter residents not receiving general assistance to apply for benefits. Rodriguez further testified that it was New Haven's intention to make emergency shelter available to every general assistance recipient who had lost his or her permanent housing for one of the six statutorily enumerated reasons.

On April 21, 1993, the trial court lifted the temporary injunction against the closing of the overflow shelter and denied the plaintiffs' application for a stay pending appeal of the court's November, 1992 decision. The court further stated that it would defer "action on the

[city's compliance] plan and [the plaintiffs'] objections thereto for 60 days, after which time a meeting will be held with counsel to examine the operation of the plan [and] the situation then existing." The court made no findings of fact in conjunction with any of these orders.

On April 22, 1993, immediately after the trial court had denied the plaintiffs' application for a temporary injunction and a stay pending appeal, the plaintiffs withdrew their objections to the compliance plan, so that the parties would be able to secure a final judgment from which an appeal could be taken. On May 25, 1993, the trial court rendered judgment approving and incorporating the compliance plan. Pursuant to the court's judgment, New Haven was required to ensure that shelter was available to those persons who fall within the mandate of General Statutes (Rev. to 1993) §§ 17-273, 17-273b and 17-273d.

New Haven then appealed from the judgment of the trial court to the Appellate Court and the plaintiffs cross appealed. We transferred the appeals to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

As in *Moore* v. *Ganim*, supra, 233 Conn. 569–70, "[w]e are hampered in our consideration of the plaintiffs' constitutional claims in this case because the plaintiffs did not seek a finding of facts from the trial court . . . . A party mounting a constitutional challenge to the validity of a statute must provide an adequate factual record in order to meet its burden of demonstrating the statute's adverse impact on some protected interest of its own, in its own particular case, and not merely under some hypothetical set of facts as yet unproven. Whether a case comes to us by way of reservation or after a final judgment, the rule is the same. We do not give advisory opinions, nor do we sit as roving com-

missions assigned to pass judgment on the validity of legislative enactments. Determination of the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function. *International Longshoremen's & Warehousemen's Union, Local 37* v. *Boyd*, 347 U.S. 222, 224, 74 S. Ct. 447, 98 L. Ed. 650 (1954). . . . *Motor Vehicle Manufacturers Assn. of the United States, Inc.* v. *O'Neill*, 203 Conn. 63, 75, 523 A.2d 486 (1987); see also *Lehrer* v. *Davis*, 214 Conn. 232, 234–35, 571 A.2d 691 (1990); *State* v. *Zach*, 198 Conn. 168, 176–78, 502 A.2d 896 (1985)." (Internal quotation marks omitted.)

In order to decide the plaintiffs' constitutional claims, we cannot simply rely on the factual findings incorporated in the trial court's 1989 decision, because there is no way to determine either that the individuals who had been unable to find shelter in 1989 still were in need of shelter or that those individuals would be ineligible for shelter under the revised statutory scheme. Nevertheless, as in *Moore* v. *Ganim*, supra, 233 Conn. 570, we assume that the trial court found credible all of the testimony presented on behalf of the plaintiffs at the April, 1993 hearing. We further consider that evidence as if it had been provided to the trial court in November, 1992, when the trial court rejected the plaintiffs' constitutional claims and consider the facts in the light most favorable to the plaintiffs.

Interpreted most favorably to the plaintiffs, the record shows that there were forty-two persons living in the New Haven shelters who were not receiving general assistance and thus would not have been eligible for shelter under the new statutory scheme unless they applied for and were awarded general assistance. There was no evidence as to the reasons that those individuals were not receiving general assistance except for

the testimony provided by Baines and Klopp. Baines had been denied general assistance because of "inadequate documentation" and had not appealed the denial; Klopp had been denied general assistance because of his refusal to comply with eligibility requirements, and his denial had been upheld by city and state fair hearing officers and the Superior Court. The only other evidence relating to individuals not receiving general assistance was provided by Beedy, who had been denied general assistance for three months because he had been fired from his job for cause, but who in fact was receiving shelter through a private organization. The record also showed that, on the night when the informal survey was taken, only two of the thirty-seven shelter residents who were receiving general assistance had adequate documentation to prove that they lost their permanent housing for one of the six statutorily enumerated reasons. The record did not show whether the other thirty-five individuals could have secured adequate documentation or, if not, the reasons why they had lost their permanent housing. There was no evidence that any recipient of general assistance had reached the end of his or her nine month benefits period and was in need of shelter for the three additional months. Finally, there was no testimony from individuals not currently living in the city shelters who were in need of shelter.

In its appeal, New Haven claims that the court had improperly: (1) failed to dismiss its 1989 order in light of the revisions made by Spec. Sess. P.A. 92-16; and (2) required New Haven to submit a compliance plan and improperly subjected it to the continuing oversight of the court. In their cross appeal, the plaintiffs claim that the government has an affirmative obligation under the Connecticut constitution to provide *all* needy citizens with emergency shelter and that the compliance plan would not adequately fulfill the government's

obligation, because it would only guarantee shelter for those who met the eligibility criteria set out in General Statutes (Rev. to 1993) § 17-273d. We are not persuaded by these claims.

I

Before reaching the parties' claims, we must address whether the trial court had subject matter jurisdiction to hear the plaintiffs' constitutional claims because the state, arguably an indispensable party, was not joined in the trial court as a party to the action. The plaintiffs claim that because the obligation of providing shelter historically has been delegated to the towns as agents of the state and because it was New Haven's actions that harmed the plaintiffs, it is New Haven's constitutional obligation to provide shelter.[18] In contrast, New Haven contends that the state is an indispensable party to this action because any constitutional obligation to provide shelter rests on the state, not on any individual municipality. New Haven relies on the principle that municipalities are creatures of the state, with no independent responsibility absent authorization or delegation by the state.

Contrary to New Haven's argument, the plaintiffs' failure to join the state as an indispensable party did not implicate the trial court's subject matter jurisdiction nor does it implicate this court's subject matter jurisdiction over the appeal. *Fong* v. *Planning & Zoning Board of Appeals*, 212 Conn. 628, 634–36, 563 A.2d 293 (1989); see General Statutes § 52-108[19]; Practice

---

[18] The plaintiffs concede that they could have joined the state as a party had they wished to do so and that the legislature could amend the statute that delegates to the towns the obligation to provide emergency shelter.

[19] General Statutes § 52-108 provides: "NONJOINDER AND MISJOINDER OF PARTIES. An action shall not be defeated by the nonjoinder or misjoinder of parties. New parties may be added and summoned in, and parties misjoined may be dropped, by order of the court, at any stage of the action, as the court deems the interests of justice require."

Book § 100.[20] Nevertheless, a court may refuse to proceed with litigation if a claim cannot properly be adjudicated without the presence of those indispensable persons whose substantive rights and interests will be necessarily and materially affected by its outcome. General Statutes § 52-102 (2);[21] Practice Book § 99.[22] "Parties have been termed indispensable when their interest in the controversy is such that a final decree cannot be made without either affecting that interest or leaving the controversy in such condition that its final disposition may be inconsistent with equity and good conscience." *Gaudio* v. *Gaudio*, 23 Conn. App. 287, 305–306, 580 A.2d 1212, cert. denied, 217 Conn. 803, 584 A.2d 471 (1990); see *Stamford Ridgeway Associates* v. *Board of Representatives*, 214 Conn. 407, 439, 572 A.2d 951 (1990); *Sturman* v. *Socha*, 191 Conn. 1, 6, 463 A.2d 527 (1983); *Standard Mattress Co.* v. *Hartford*, 31 Conn. Sup. 279, 288, 329 A.2d 613 (1974), citing *Shields* v. *Barrow*, 58 U.S. (17 How.) 130, 139, 15 L. Ed. 158 (1855). Joinder of indispensable parties is mandated because due process principles make it

[20] Practice Book § 100 provides: "[ADDITIONS OR SUBSTITUTIONS OF PARTIES]—NONJOINDER AND MISJOINDER

"Except as provided in Secs. 157 and 198 no action shall be defeated by the nonjoinder or misjoinder of parties. New parties may be added and summoned in, and parties misjoined may be dropped, by order of the court, at any stage of the cause, as it deems the interests of justice require."

[21] General Statutes § 52-102 provides in relevant part: "JOINDER OF PERSONS WITH INTEREST ADVERSE TO PLAINTIFF AND OF NECESSARY PERSONS. Upon motion made by any party or nonparty to a civil action, the person named in the party's motion or the nonparty so moving, as the case may be . . . (2) shall be made a party by the court if that person is necessary for a complete determination or settlement of any question involved therein; provided no person who is immune from liability shall be made a defendant in the controversy."

[22] Practice Book § 99 provides: "The court may determine the controversy as between the parties before it, if it can do so without prejudice to the rights of others; but, if a complete determination cannot be had without the presence of other parties, the court may direct that they be brought in. If a person not a party has an interest or title which the judgment will affect, the court, on his motion, shall direct him to be made a party."

"essential that [such parties] be given notice and an opportunity to protect [their] interests by making [them] a party to the [action]." *Fong* v. *Planning & Zoning Board of Appeals*, supra, 634.

The question of whether the plaintiffs should have joined the state as a party to this litigation was not raised in the trial court. The issue was raised, however, on appeal by New Haven and by the state, which successfully petitioned this court to permit it to appear as amicus curiae. Although, pursuant to Practice Book § 198,[23] the exclusive method to raise the issue of nonjoinder of an indispensable party is by way of a motion to strike the plaintiff's complaint, "[w]e believe that because of the definition of indispensable party and its relation to the proper disposition of an action, it is necessary for us to review the . . . claim even though [the defendant] did not move to strike the plaintiff's complaint." *W. G. Glenney Co.* v. *Bianco*, 27 Conn. App. 199, 203, 604 A.2d 1345 (1992) (discussing conflicting case law and statutes regarding reviewability of claims for failure to join indispensable party); see *Levine* v. *Police Commission*, 28 Conn. App. 344, 351, 612 A.2d 787, cert. denied, 223 Conn. 923, 614 A.2d 823 (1992).

Given the importance of the constitutional claims raised and the significant ramifications for the state of a conclusion by this court that the state has an affirmative constitutional duty to provide its citizens with shelter, sound jurisprudential considerations ordinarily would compel the conclusion that the state is an indispensable party that should have been afforded an opportunity to participate in the proceedings at the trial level. The circumstances of this appeal, however, are unique in that the state appeared in this appeal as ami-

---

[23] Practice Book § 198 provides: "MOTION FOR MISJOINDER OF PARTIES

"The exclusive remedy for misjoinder of parties is by motion to strike. As set forth in Sec. 152, the exclusive remedy for nonjoinder of parties is by motion to strike."

cus curiae and fully participated in briefing the issues and at oral arguments. In addition, the state was a party in the companion case of *Moore* v. *Ganim*, supra, 233 Conn. 557, which we determine to be dispositive of the plaintiffs' constitutional claims in this case. Because the result we reach on the plaintiffs' claims in this case is compelled by our decision in *Moore,* and because that result is favorable to the state, we conclude that the state was neither prejudiced nor otherwise adversely affected by not being joined as a party at trial.

## II

We first address the plaintiffs' cross appeal. The plaintiffs argue that an affirmative governmental obligation to provide shelter to its citizens should be recognized under the Connecticut constitution: (1) as a constitutionally incorporated right under article first, § 10;[24] or (2) as an unenumerated right implicit in the constitution as evidenced by its preamble,[25] the preamble to article first,[26] and the term "social compact" found in article first, § 1.[27] The plaintiffs further con-

[24] Article first, § 10, contained in the Declaration of Rights of the Connecticut constitution, provides in relevant part: "All courts shall be open, and every person, for an injury done to him in his person, property, or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[25] The preamble to the constitution of Connecticut provides: "The people of Connecticut, acknowledging with gratitude the good province of God, in having permitted them to enjoy a free government; do, in order more effectually to define, secure, and perpetuate the liberties, rights, and privileges which they have derived from their ancestors; hereby, after a careful consideration and revision, ordain and establish the following constitution and form of civil government."

[26] The preamble to article first of the constitution of Connecticut, which contains the Declaration of Rights, provides in relevant part: "That the great and essential principles of liberty and free government may be recognized and established, we declare . . . ."

[27] The constitution of Connecticut, article first, § 1, provides: "All men when they form a social compact, are equal in rights; and no man, or set of men are entitled to exclusive public emoluments or privileges from the community."

tend that, both before and after the enactment of Spec. Sess. P.A. 92-16, New Haven consistently has failed to fulfill this constitutional obligation. According to the plaintiffs, the implementation of the compliance plan pursuant to Spec. Sess. P.A. 92-16, which will restrict shelter beds to certain eligible individuals, only will exacerbate the scope of the constitutional violation. We disagree.

The disposition of the plaintiffs' claim is controlled by our decision today in *Moore* v. *Ganim*, supra, 233 Conn. 580. Consistent with our reasoning and conclusions in that case, we conclude that the state does not have an obligation under the state constitution to provide subsistence benefits, including an obligation to provide shelter.[28]

### III

In its appeal, New Haven claims that the trial court improperly: (1) failed to dismiss the 1989 order in light of the revisions made by Spec. Sess. P.A. 92-16; and (2) required New Haven to submit a compliance plan and subjected it to the court's continuing oversight of its shelters. We disagree.

### A

New Haven's first claim is that, in responding to its 1992 motion for reconsideration, the trial court improperly failed to dismiss the 1989 injunctive order as moot. In particular, New Haven argues that the changes implemented by Spec. Sess. P.A. 92-16 rendered moot the 1989 order and deprived the court of subject matter jurisdiction to continue to monitor New Haven's compliance with the statute.

---

[28] Although the plaintiffs in *Moore* did not claim that an unenumerated right to receive subsistence benefits from the government inheres in the preamble to article first of the state constitution, our reasoning in *Moore* as to the potential existence of such a right under the preamble to the constitution is applicable to the preamble to article first as well.

"It is well established that an [action] is moot when there no longer exists an actual controversy between the parties or when the court can no longer grant any relief. *Shays* v. *Local Grievance Committee,* 197 Conn. 566, 571, 499 A.2d 1158 (1985); *Reynolds* v. *Vroom,* 130 Conn. 512, 515, 36 A.2d 22 (1944)." *Amalgamated Transit Union* v. *Laidlaw Transit,* 33 Conn. App. 1, 5–6, 632 A.2d 713 (1993). New Haven argues that Spec. Sess. P.A. 92-16 nullified the controversy between the parties because that act changed New Haven's obligation under the 1989 order to provide emergency shelter to all homeless individuals. In support of its position, New Haven cites *Dept. of Treasury* v. *Galioto,* 477 U.S. 556, 106 S. Ct. 2683, 91 L. Ed. 2d 459 (1986), and *Benkendorf* v. *Hazel Crest,* 804 F.2d 99 (7th Cir. 1986), for the proposition that a case must be dismissed as moot when the statute involved in the litigation is amended or a new statute is enacted. We disagree with New Haven's reading of those precedents.

The cited cases involved statutory revisions that altered the relief afforded under the statute and deprived the court of the ability to grant any practical relief. See also *Horton* v. *Meskill,* 195 Conn. 24, 42–43, 486 A.2d 1099 (1985); *DelMastro* v. *Liquor Control Commission,* 146 Conn. 740, 741, 154 A.2d 241 (1959); *Wylie* v. *Warden,* 33 Conn. App. 902, 632 A.2d 1133 (1993); *Connecticut Resources Recovery Authority* v. *Freedom of Information Commission,* 19 Conn. App. 489, 494, 562 A.2d 1145 (1989). In the current case, Spec. Sess. P.A. 92-16 has no such effect. Although it is true that the scope of New Haven's statutory obligation to provide shelter is substantially limited by Spec. Sess. P.A. 92-16, the amendment does not alter the court's ability to grant relief for New Haven's failure to comply with the mandates of the new statute. Therefore, we conclude that the trial court properly denied New Haven's request to dismiss the 1989 order upon New Haven's motion for reconsideration.

B

New Haven also contends that the trial court improperly required it to submit a compliance plan and improperly subjected it to the continuing oversight by the court of its administration of its shelters. Specifically, New Haven argues that there was an insufficient factual basis for the trial court's conclusion that the city did not have an adequate procedure to ensure that persons entitled to shelter under General Statutes (Rev. to 1993) § 17-273d received such shelter. New Haven asserts that, because it was not proven that anyone entitled to shelter had been denied that right, the trial court's order was improper. In addition, New Haven argues that the court abused its authority in ordering New Haven to submit a new compliance plan under the revised statute and by subjecting New Haven to the court's continuing oversight.

We have long held that "where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980); see also Practice Book § 4061[29]; *Einbinder* v. *Board of Tax Review*, 217 Conn. 240, 242, 584 A.2d 1188 (1991). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has

---

[29] Practice Book § 4061 provides in relevant part: "The court may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that the decision is otherwise erroneous in law. . . .

"It is the responsibility of the appellant to provide an adequate record for review."

been committed." (Internal quotation marks omitted.) *Crowell* v. *Danforth*, 222 Conn. 150, 156, 609 A.2d 654 (1992); see also *Adriani* v. *Commission on Human Rights & Opportunities*, 228 Conn. 545, 548–49, 636 A.2d 1360 (1994). Whether New Haven's procedures adequately met the mandate of General Statutes (Rev. to 1993) § 17-273d, as amended, was a factual determination. Our review of the record leads us to conclude that the trial court's determination that New Haven was not in compliance with the statute was reasonably supported by the evidence and, therefore, was not clearly erroneous.

New Haven also claims that the trial court exceeded the scope of its authority by fashioning an equitable order requiring New Haven to submit a compliance plan. The Superior Court is a court of general jurisdiction that derives its power in civil matters from General Statutes § 52-1.[30] In the exercise of its equitable powers, a court necessarily has the authority to retain supervisory jurisdiction to assure compliance with its mandate. *Keeney* v. *L & S Construction*, 226 Conn. 205, 210, 626 A.2d 1299 (1993); *Park City Hospital* v. *Commission on Hospitals & Health Care*, 210 Conn. 697, 701–702, 556 A.2d 602 (1989); *Horton* v. *Meskill*, supra, 195 Conn. 26. We conclude, on the basis of the record before us, that the trial court did not abuse its discretion when it ordered New Haven to file a compliance plan and subjected it to continuing oversight.

The judgment is affirmed.

In this opinion CALLAHAN, BORDEN and PALMER, Js., concurred.

---

[30] General Statutes § 52-1 provides: "ADMINISTRATION OF LEGAL AND EQUITABLE RIGHTS. The superior court may administer legal and equitable rights and apply legal and equitable remedies in favor of either party in one and the same civil action so that legal and equitable rights of the parties may be enforced and protected in one action. Whenever there is any variance between the rules of equity and the rules of the common law in reference to the same matter, the rules of equity shall prevail."

PETERS, C. J., concurring. I agree with parts I and III of the majority opinion, and I concur in the result with respect to part II.

The issue in this case is whether the government has abrogated its constitutional obligation to provide minimal subsistence by restricting government funded emergency shelter only to those who meet the eligibility requirements contained in General Statutes (Rev. to 1993) §§ 17-273, 17-273b and 17-273d. In particular, the plaintiffs ask us to declare that the government must provide shelter to all needy individuals even if they (1) have been deemed ineligible for general assistance; see General Statutes (Rev. to 1993) §§ 17-273, 17-273b, 17-273d; (2) already have received general assistance for the first nine months of the year; see General Statutes (Rev. to 1993) § 17-273b; or (3) have lost their permanent housing for a reason not enumerated in § 17-273d.

In accordance with my concurrence in *Moore* v. *Ganim*, 233 Conn. 557, 616, 660 A.2d 742 (1995), as a matter of law, I am persuaded that our state constitution obligates the government to provide minimal subsistence for the poor. On the factual record presented by these plaintiffs, however, I am not persuaded that the government has abrogated its constitutional obligation. I therefore would affirm.

In *Moore* v. *Ganim*, supra, 233 Conn. 640 (*Peters, C. J.*, concurring), I stated that, in my view, "although there is a minimal obligation to provide support, elected officials have discretion to determine who is eligible for support, to fix the level of support, to determine the means by which support is to be provided, and to impose conditions on the provision of support, such as the condition that recipients perform work or acquire other skills." In this case, as in *Moore*, the plaintiffs have failed to prove that the legislature has exceeded its constitutional discretion.

At the outset, I see no impropriety in the legislature's decision to make eligibility for shelter depend on a prior administrative determination of eligibility for general assistance.[1] Elected officials always have had the ability to set the eligibility requirements for governmental support. Id. Nothing in the constitution prohibits the state from regularizing eligibility determinations for both emergency shelter and general assistance cash grants. Indeed, effective implementation of the constitutional obligation may demand such regularized eligibility criteria.

I also see no impropriety in the legislative decision to provide emergency shelter only to general assistance recipients who have lost their permanent housing for a valid reason. The legislature has set the amounts of general assistance cash grants with the understanding that a portion of each grant is to be used for permanent housing expenses.[2] It appears eminently reasonable, therefore, for the legislature to require that portion of the cash grant to be used for such housing, and to limit the availability of emergency shelter to situations in which such housing truly is unavailable because of, inter alia, eviction, foreclosure, domestic violence, uninhabitability, criminal activity by a cotenant, or certain unlawful actions by a landlord. See General Statutes (Rev. to 1993) § 17-273d.

Finally, there is no evidence in the record showing that any person was both (1) unable to secure the necessaries of life, such that, in the absence of governmental support, he or she would face a grave threat to his or her health or welfare, and (2) unable to comply with

[1] The plaintiffs in this case have not alleged that the eligibility requirements for general assistance themselves are unconstitutional.

[2] See Regs., Conn. State Agencies § 17-3a-11 (G) (1) [General Assistance Policy Manual (1993 Ed.) § I (G) (1)]. The plaintiffs have not alleged, and the trial court did not find, that the general assistance grant level is inadequate to meet this goal.

the conditions the statute imposes, for reasons beyond his or her control. See *Moore* v. *Ganim*, supra, 233 Conn. 642–43 (*Peters, C. J.*, concurring). All of the evidence in the record relating to unsheltered individuals was presented in 1989, before the statute was amended and before the trial court permanently enjoined New Haven to provide emergency shelter to all who were statutorily eligible for such shelter. There are only three individuals whose circumstances are described in the record who presumably will not be provided emergency shelter pursuant to the permanent injunction, because they are ineligible for such shelter under the new statutory scheme. Of those three, two had been denied general assistance for failure to work or to comply with other reasonable eligibility requirements; moreover, one of those two was receiving shelter from a private organization. The third had been denied general assistance because of a typographical error on his prison release form, but he had neither appealed from the denial nor demonstrated that such an appeal would have been futile. Having failed to prove a violation of the constitutional rights of any identifiable member of the plaintiff class, the plaintiffs are not entitled to relief.

I respectfully concur in affirming the judgment of the trial court.

BERDON, J., with whom KATZ, J., joins, dissenting. I agree with the majority opinion as to part I, which pertains to subject matter jurisdiction, and part III, which pertains to the trial court's continuing oversight of this matter.[1] I disagree, however, with part II of the

---

[1] Specifically, I agree with the majority with respect to the following: (1) although the state is an indispensable party, the failure to join it does not implicate our subject matter jurisdiction and, under the circumstances of this case, we should determine the merits of the appeal; and (2) the trial court was correct in ordering New Haven to submit a compliance plan at least as to its obligations to provide shelter for the poor as required by General Statutes (Rev. to 1993) § 17-273d.

majority opinion, which addresses the state constitutional right to shelter.

In accordance with my dissent in *Moore* v. *Ganim*, 233 Conn. 557, 643–44, 660 A.2d 742 (1995), I would hold that, under our state constitution, the poor have a right to basic shelter—that is, a cot in a dormitory style barrack—when they have no other place to go. Although the trial court failed to make specific factual findings, the record reveals that the plaintiffs in this case are entitled to this form of relief. First, this case was certified as a class action on behalf of homeless people who have no place to live and who require emergency shelter. Second, the record is replete with evidence that members of this class "have been forced to endure the dead of winter in abandoned houses with no beds and no heat, or in the outdoors, where they have been subject to physical abuse while attempting to use park benches as their beds." *Moore* v. *Ganim*, supra, 648 (*Berdon, J.*, dissenting).

Accordingly, I dissent.

