DIANE BATTE-HOLMGREN ET AL. *v.*
COMMISSIONER OF PUBLIC
HEALTH ET AL.
(SC 17505)

Sullivan, C. J., and Norcott, Katz, Vertefeuille and Zarella, Js.*

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued February 8, 2006—officially released February 13, 2007

*Jan C. Trendowski*, for the appellants (plaintiffs).

*Richard Blumenthal*, attorney general, with whom were *Perry Zinn-Rowthorn* and *Jane R. Rosenberg*, assistant attorneys general, for the appellees (defendants).

*John B. Farley* filed a brief for the American Cancer Society, Inc., as amicus curiae.

*Opinion*

VERTEFEUILLE, J. The plaintiffs,[1] who are owners of businesses affected by recently enacted legislation banning smoking in restaurants and cafés, appeal from the judgment of the trial court rendered after the granting of a motion to strike the complaint filed by the defendants, the commissioner of public health and the

[1] The four plaintiffs are Diane Batte-Holmgren, Gina MacDonald and John Woermer, each of whom is an owner of a café operating under a permit issued pursuant to General Statutes § 30-22a, and Irving Nielsen, who is the owner of a restaurant with a permit issued pursuant to General Statutes § 30-22.

attorney general. The plaintiffs challenge the constitutionality of the legislation, arguing that the smoking ban violates the equal protection clauses of the state and federal constitutions.[2] The dispositive issues on appeal are: (1) whether this court has subject matter jurisdiction over the present case despite the plaintiffs' failure to provide the notice mandated by our rules of practice to interested persons in declaratory judgment actions; and (2) whether the smoking ban legislation violates the plaintiffs' equal protection rights. We first conclude that we have subject matter jurisdiction to hear this appeal despite the plaintiffs' lack of compliance with the notice requirements. We also determine that the plaintiffs' equal protection rights have not been violated. Accordingly, we affirm the judgment of the trial court.

The procedural history of the present case is undisputed. In July, 2004, the plaintiffs filed the complaint in the present action pursuant to 42 U.S.C. § 1983, alleging that Public Acts 2003, No. 03-45, which amended General Statutes § 19a-342[3] to prohibit smoking in res-

---

[2] The federal equal protection clause, § 1, of the fourteenth amendment to the United States constitution, provides in relevant part: "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

Article first, § 20, of the constitution of Connecticut provides in relevant part: "No person shall be denied the equal protection of the law . . . ."

[3] General Statutes § 19a-342 provides: "(a) As used in this section, 'smoke' or 'smoking' means the lighting or carrying of a lighted cigarette, cigar, pipe or similar device.

"(b) (1) Notwithstanding the provisions of section 31-40q, no person shall smoke: (A) In any building or portion of a building owned and operated or leased and operated by the state or any political subdivision thereof; (B) in any area of a health care institution; (C) in any area of a retail food store; (D) in any restaurant; (E) in any area of an establishment with a permit issued for the sale of alcoholic liquor pursuant to section 30-20a, 30-21, 30-21b, 30-22, 30-22c, 30-28, 30-28a, 30-33a, 30-33b, 30-35a, 30-37a, 30-37e or 30-37f, in any area of an establishment with a permit for the sale of alcoholic liquor pursuant to section 30-23 issued after May 1, 2003, and, on and after April 1, 2004, in any area of an establishment with a permit issued for the sale of alcoholic liquor pursuant to section 30-22a or 30-26 or the bar area

taurants and cafés and other public facilities, but not

of a bowling establishment holding a permit pursuant to subsection (a) of section 30-37c; (F) within a school building while school is in session or student activities are being conducted; (G) in any passenger elevator, provided no person shall be arrested for violating this subsection unless there is posted in such elevator a sign which indicates that smoking is prohibited by state law; (H) in any dormitory in any public or private institution of higher education; or (I) on and after April 1, 2004, in any area of a dog race track or a facility equipped with screens for the simulcasting of off-track betting race programs or jai alai games. For purposes of this subsection, 'restaurant' means space, in a suitable and permanent building, kept, used, maintained, advertised and held out to the public to be a place where meals are regularly served to the public.

"(2) This section shall not apply to (A) correctional facilities; (B) designated smoking areas in psychiatric facilities; (C) public housing projects, as defined in subsection (b) of section 21a-278a; (D) classrooms where demonstration smoking is taking place as part of a medical or scientific experiment or lesson; (E) smoking rooms provided by employers for employees, pursuant to section 31-40q; (F) notwithstanding the provisions of subparagraph (E) of subdivision (1) of this subsection, the outdoor portion of the premises of any permittee listed in subparagraph (E) of subdivision (1) of this subsection, provided, in the case of any seating area maintained for the service of food, at least seventy-five per cent of the outdoor seating capacity is an area in which smoking is prohibited and which is clearly designated with written signage as a nonsmoking area, except that any temporary seating area established for special events and not used on a regular basis shall not be subject to the smoking prohibition or signage requirements of this subparagraph; or (G) any tobacco bar, provided no tobacco bar shall expand in size or change its location from its size or location as of December 31, 2002. For purposes of this subdivision, 'outdoor' means an area which has no roof or other ceiling enclosure, 'tobacco bar' means an establishment with a permit for the sale of alcoholic liquor to consumers issued pursuant to chapter 545 that, in the calendar year ending December 31, 2002, generated ten per cent or more of its total annual gross income from the on-site sale of tobacco products and the rental of on-site humidors, and 'tobacco product' means any substance that contains tobacco, including, but not limited to, cigarettes, cigars, pipe tobacco or chewing tobacco.

"(c) The operator of a hotel, motel or similar lodging may allow guests to smoke in not more than twenty-five per cent of the rooms offered as accommodations to guests.

"(d) In each room, elevator, area or building in which smoking is prohibited by this section, the person in control of the premises shall post or cause to be posted in a conspicuous place signs stating that smoking is prohibited by state law. Such signs, except in elevators, restaurants, establishments with permits to sell alcoholic liquor to consumers issued pursuant to chapter

in casinos and most private clubs,[4] violates the plaintiffs' right to equal protection under the state and federal constitutions. The plaintiffs sought declaratory and injunctive relief, as well as attorney's fees pursuant to 42 U.S.C. § 1988.

The defendants thereafter filed a motion to strike the complaint, arguing that the complaint had failed to set forth allegations sufficient to establish an equal protection violation.[5] The trial court granted the motion to strike on equal protection grounds and, subsequently,

545, hotels, motels or similar lodgings, and health care institutions, shall have letters at least four inches high with the principal strokes of letters not less than one-half inch wide.

"(e) Any person found guilty of smoking in violation of this section, failure to post signs as required by this section or the unauthorized removal of such signs shall have committed an infraction.

"(f) Nothing in this section shall be construed to require any smoking area in any building.

"(g) The provisions of this section shall supersede and preempt the provisions of any municipal law or ordinance relative to smoking effective prior to, on or after October 1, 1993."

We note that minor technical changes, not relevant to this appeal, were made to subsection (b) of § 19a-342 in 2004. See Public Acts 2004, No. 04-9, § 1. For purposes of clarity, we refer herein to the current revision of the statute.

[4] Private clubs possess liquor permits pursuant to General Statutes § 30-23, and § 19a-342 (b) (1) (E) subjects only those clubs whose permits are issued after May 1, 2003, to the smoking ban. Casinos obtain permits pursuant to General Statutes § 30-37k, which is not included in the list of permit types subject to the ban under § 19a-342 (b) (1) (E).

[5] The defendants also claimed that the plaintiffs had failed to bring the action against the proper parties because, they asserted, neither the attorney general nor the commissioner of public health is responsible for enforcing the smoking ban. The plaintiffs indicated in their objection to the motion to strike that they named the attorney general as a defendant solely for notice purposes and conceded that he cannot be held liable in this action. The trial court indicated in its memorandum of decision on the motion to strike that it was not ruling on the defendants' claim that the plaintiffs had named the wrong parties as defendants because the parties agreed at oral argument that the court would decide the substantive legal issues.

rendered judgment in favor of the defendants. This appeal followed.[6]

Following oral argument, we ordered the parties, sua sponte, to file supplemental briefs addressing the following questions: "Did the plaintiffs at any time give notice to all interested persons of their request for a declaratory judgment pursuant to Practice Book § 17-56? If not: (1) are the interests of the other interested persons protected by the defendants and/or their counsel, the [a]ttorney [g]eneral? or (2) does the failure to give such notice deprive this court of subject matter jurisdiction of the plaintiffs' appeal? See *Stafford Higgins Industries, Inc.* v. *Norwalk*, 245 Conn. 551, 577 n.20, 715 A.2d 46 (1998)." The parties thereafter filed supplemental briefs as ordered, both of which acknowledged that notice of the declaratory judgment action was not given to certain interested persons pursuant to Practice Book § 17-56 (b).

I

We first consider whether the trial court had subject matter jurisdiction to render judgment in the present case despite the lack of notice to interested persons. Although the issue has not been raised by the parties, "a subject matter jurisdictional defect may not be waived . . . [or jurisdiction] conferred by the parties, explicitly or implicitly. . . . [T]he question of subject matter jurisdiction is a question of law . . . and, once raised, either by a party or by the court itself, the question must be answered before the court may decide the case. . . . We have long held that because [a] determination regarding a trial court's subject matter jurisdiction is a question of law, our review is plenary." (Citation omitted; internal quotation marks omitted.)

---

[6] The plaintiffs appealed from the judgment of the trial court to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

*Commissioner of Transportation* v. *Rocky Mountain, LLC*, 277 Conn. 696, 703, 894 A.2d 259 (2006).

Our rules of practice provide that, in declaratory judgment actions, the plaintiff is required to provide notice to or seek joinder of "[a]ll persons who have an interest in the subject matter of the requested declaratory judgment that is direct, immediate and adverse to the interest of one or more of the plaintiffs or defendants in the action . . . ." Practice Book § 17-56 (b). The plaintiff further is required to append to the complaint "a certificate stating that all such interested persons have been joined as parties to the action or have been given reasonable notice thereof." Practice Book § 17-56 (b). In the present case, the plaintiffs acknowledge that they provided notice of their request for a declaratory judgment only to the defendants.[7] They further admit that they failed to append the certificate of notice to their complaint.

This court previously has stated that the failure to provide notice to all interested parties in a declaratory judgment action deprives the trial court of subject matter jurisdiction of the action. See, e.g., *McBurney* v. *Cirillo*, 276 Conn. 782, 793, 889 A.2d 759 (2006); *Napoletano* v. *CIGNA Healthcare of Connecticut, Inc.*, 238 Conn. 216, 224–25, 680 A.2d 127 (1996), cert. denied, 520 U.S. 1103, 117 S. Ct. 1106, 137 L. Ed. 2d 308 (1997); *Hopkins* v. *Pac*, 176 Conn. 318, 319, 407 A.2d 979 (1978). In recent years, however, the court has been willing to remand such cases to allow the defect to be cured, signaling a shift in the court's understanding of the nature of the defect. See *Serrani* v. *Board of Ethics*,

[7] Although this court has required compliance with the notice provision even when the record does not indicate any specific interested persons; see *Serrani* v. *Board of Ethics*, 225 Conn. 305, 308–309, 622 A.2d 1009 (1993); we note that, in the present case, municipal officials who bear responsibility for enforcing the legislation may have an interest in the question of whether the statute is constitutional. See General Statutes § 19a-342 (e).

225 Conn. 305, 309 n.5, 622 A.2d 1009 (1993) ("[u]nlike other jurisdictional defects implicating the trial court's subject matter jurisdiction," failure to comply with notice requirement can be cured); *Connecticut Ins. Guaranty Assn.* v. *Raymark Corp.*, 215 Conn. 224, 230, 575 A.2d 693 (1990) ("[t]he conclusion we have reached that the court lacked subject matter jurisdiction to render its declaratory judgment does not require that the action be dismissed upon remand, because the jurisdictional defect can be cured by further proceedings in the trial court"); cf. *Gianetti* v. *Norwalk Hospital*, 211 Conn. 51, 56, 557 A.2d 1249 (1989) (because no notice of declaratory judgment action provided to interested persons, reframing questions on appeal to affect only parties). The conclusion that such defects can be remedied on remand implicitly calls into question the jurisdictional nature of the defect because it conflicts with the well established principle that a judgment rendered without subject matter jurisdiction is void. See *Commissioner of Transportation* v. *Rocky Mountain, LLC*, supra, 277 Conn. 725.

In addition, this court recently has questioned explicitly whether the failure to give notice of a declaratory judgment action is properly a question of subject matter jurisdiction. In *Stafford Higgins Industries, Inc.* v. *Norwalk*, supra, 245 Conn. 577 n.20, the court noted that "[r]ecent developments in our subject matter jurisdiction jurisprudence in other areas may cast doubt on the doctrine, however well established, that a failure to give the notice required under Practice Book § [17-56 (b)] is a *subject matter jurisdictional* defect; see, e.g., *Russo* v. *Watertown*, [184 Conn. 30, 33–35, 441 A.2d 56 (1981)]; as opposed, for example, to a defect more closely resembling the failure to cite in or give notice to a necessary or indispensable party to litigation, which is not subject matter jurisdictional. See *Fong* v. *Planning & Zoning Board of Appeals*, 212 Conn. 628, 635–36,

563 A.2d 293 (1989). We have indicated that subject matter jurisdiction is, with certain constitutional exceptions not applicable here, a matter of statute, not judicial rule making. See *Simms* v. *Warden*, 229 Conn. 178, 184, 640 A.2d 601 (1994). General Statutes § 52-29 (a) gives the Superior Court subject matter jurisdiction to render declaratory judgments, whether or not further relief is or could be claimed. Subsection (b) of § 52-29 authorizes the judges to make such orders and rules as they may deem necessary or advisable to effectuate subsection (a). Practice Book § [17-56 (b)] is an example of such a rule. It may be questionable that the judges may, pursuant to their rule-making authority under subsection (b) of § 52-29, limit the subject matter jurisdiction created by subsection (a) of § 52-29. See, e.g., General Statutes § 51-14 (a) (The judges of the Supreme Court, the judges of the Appellate Court, and the judges of the Superior Court shall adopt and promulgate and may from time to time modify or repeal rules and forms regulating pleading, practice and procedure in judicial proceedings in courts in which they have the constitutional authority to make rules, for the purpose of simplifying proceedings in the courts and of promoting the speedy and efficient determination of litigation upon its merits. . . . Such rules shall not abridge, enlarge or modify any substantive right nor the jurisdiction of any of the courts. . . .)." (Emphasis in original; internal quotation marks omitted.)

This questioning by the court of its previous conclusion that the failure to provide notice in a declaratory judgment action is a subject matter jurisdictional defect apparently was recognized by the judges of the Superior Court in 2000, when the Practice Book provisions governing declaratory judgment actions were amended to provide that "no declaratory judgment action shall be defeated by the nonjoinder of parties or the failure to give notice to interested persons." Practice Book § 17-

56 (c). The commentary to this section indicates that this new section "is intended to make it clear that defects in joinder and notice are nonjurisdictional." Practice Book, 2000, § 17-56, commentary. Although the rules of practice may not expand or contract the court's subject matter jurisdiction; see General Statutes § 51-14 (a); *Stafford Higgins Industries, Inc.* v. *Norwalk*, supra, 245 Conn. 577 n.20; this amendment to the rules of practice seemingly reflected this court's doubt that the failure to give notice of the declaratory judgment action would implicate the subject matter jurisdiction of the court.[8] We now reconsider our prior cases that have concluded that the failure to provide notice to interested persons of a declaratory judgment action deprives the court of subject matter jurisdiction.

The Declaratory Judgment Act, codified at General Statutes § 52-29, was adopted in 1921 to allow our trial courts to provide declaratory relief. *Braman* v. *Babcock*, 98 Conn. 549, 553, 120 A. 150 (1923). Rules of practice enacted shortly thereafter provided that "[t]he Superior Court will not render declaratory judgments . . . unless all persons having an interest in the subject matter of the complaint are parties to the action or have reasonable notice thereof." Id., 552 n.; see Practice Book, 1922, § 63 (d) (now § 17-56 [b]). This court subsequently explained that "[a]nyone with an interest in the subject matter is entitled to reasonable notice and an opportunity to be heard, whether he supports the plaintiffs' or the defendants' position." *Cavalli* v. *McMahon*, 174 Conn. 212, 216, 384 A.2d 374 (1978). This court has

[8] We note that, in *37 Huntington Street, H, LLC* v. *Hartford*, 62 Conn. App. 586, 592–93, 772 A.2d 633 (2001), the Appellate Court concluded that the 2000 amendments to the rules of practice governing declaratory judgment actions clarified that failure to provide notice to interested persons in a declaratory judgment action is a procedural defect that may be waived. The court speculated that "the amended sections were enacted to avoid having a case bounce back and forth between courts for no articulable reason of policy." Id., 592.

indicated a preference for joining interested persons as parties, rather than merely providing them with notice of the action. See, e.g., *National Transportation Co.* v. *Toquet*, 123 Conn. 468, 482–84, 196 A. 344 (1937). Simply notifying an interested person of the pendency of the action does not ensure that the person will be bound by the resulting judgment. In fact, the rules of practice, as amended in 2000, specifically provide that "[e]xcept as otherwise provided by law, no declaration shall be binding against any persons not joined as parties. If it appears to the court that the rights of nonparties will be prejudiced by its declaration, it shall order entry of judgment in such form as to affect only the parties to the action." Practice Book § 17-56 (d). Thus, the notice requirement ensures that interested persons are aware of the requested declaratory relief and are able to move to intervene to protect their interests, should they choose to do so.

Like the declaratory judgment notice rule, the purpose of our joinder rules is to ensure that all persons whose interests are implicated directly by an action are able to protect those interests through participation in the action. See *Fong* v. *Planning & Zoning Board of Appeals*, supra, 212 Conn. 637 (indispensable party is entitled to notice and opportunity to be heard to satisfy "fundamental tenets of due process"). As we have recognized, the failure to give notice to or to join an indispensable party does not impact the court's subject matter jurisdiction. General Statutes § 52-108; Practice Book § 9-19; *Bauer* v. *Souto*, 277 Conn. 829, 839, 896 A.2d 90 (2006); *Fong* v. *Planning & Zoning Board of Appeals*, supra, 635–36. Although the failure to join an indispensable party does not deprive the court of subject matter jurisdiction, the court nevertheless must consider whether the adjudication of the action in the absence of the party would violate that party's right to defend its interests and offend fundamental tenets of

due process. *Fong* v. *Planning & Zoning Board of Appeals,* supra, 637.

We perceive no valid reason for the inconsistency between the consequences of noncompliance with the declaratory judgment notice rules and the joinder rules. No public policy is served by denying subject matter jurisdiction when an interested person is not notified of a declaratory judgment action, but permitting an action to proceed when an indispensable party is absent. This inconsistency in our case law, combined with the separation of powers concerns expressed by this court in *Stafford Higgins Industries, Inc.* v. *Norwalk,* supra, 245 Conn. 577 n.20, leads us to conclude that the failure to notify interested persons in a declaratory judgment action does not implicate the court's subject matter jurisdiction. This conclusion is in harmony with our more recent cases, in which we have permitted the lack of notice to be cured, a result that is inconsistent with a conclusion that the lack of notice deprives the court of subject matter jurisdiction. We therefore now overrule our past precedent in which we concluded that the lack of notice to interested persons of the pendency of a declaratory judgment action deprives the court of subject matter jurisdiction.

Having concluded that failure to provide notice, like noncompliance with the joinder rules, is nonjurisdictional, we also conclude that failure to provide notice, like nonjoinder, may implicate due process concerns that would compel a court to require notice or joinder before proceeding with the action. "[A] court may refuse to proceed with litigation if a claim cannot properly be adjudicated without the presence of those indispensable persons whose substantive rights and interests will be necessarily and materially affected by its outcome. . . . Joinder of indispensable parties is mandated because due process principles make it essential that [such parties] be given notice and an

opportunity to protect [their] interests by making [them] a party to the [action]." (Citations omitted; internal quotation marks omitted.) *Hilton* v. *New Haven*, 233 Conn. 701, 722–23, 661 A.2d 973 (1995). Thus, we now consider whether this action should be remanded for such a purpose, or whether we may proceed with this appeal consistent with the dictates of due process.

This court's order requiring supplemental briefs asked the parties to consider whether the interests of other persons are protected by the existing parties. In their brief, the plaintiffs contend that the interests of all other persons are protected by the existing parties, which, the plaintiffs note, includes the amicus curiae American Cancer Society, Inc. The defendants also contend that the parties have represented adequately the interests of others because the issue before the court is purely a legal question, raised on a motion to strike for which no fact-finding is required, and has been thoroughly briefed by the existing parties. Moreover, the defendants claim, this court has recognized that the attorney general adequately represents the interests of potential defendants in an action challenging the constitutionality of state law. See *Horton* v. *Meskill*, 187 Conn. 187, 196, 445 A.2d 579 (1982) (towns properly barred from intervening in action challenging constitutionality of school financing scheme because attorney general defending statute). We agree.

We conclude that the interests of nonparties who may be interested in the present action, including the municipalities that bear responsibility for enforcing the smoking ban statute, have been represented adequately by the current parties. The posture of the action is such that both this court and the trial court have been asked to determine solely a legal question, the constitutionality, on equal protection grounds, of the smoking ban statute. The inquiry does not require any factual determinations. The question has been fully briefed and

argued by the parties, as well as the amicus curiae. We perceive no deficiency in the pursuit of this legal argument that would leave the interests of a potential party, either plaintiff or defendant, unprotected. Moreover, as we have noted previously, a person who is not a party generally will not be bound by a declaratory ruling. Practice Book § 17-56 (d). Thus, an interested person who is not notified of the action is subject only to the stare decisis impact of the judgment. If the situation of an interested person is quite similar to that of one of the parties, then the stare decisis impact on the interested person may be strong, but, because of the similarity of interests, the existing parties are likely to have represented well the nonparty's interests. If, on the other hand, the interested person's circumstances are sufficiently different from those of the parties, the parties' representation of the nonparty's interests may have been weak, but the case will have less precedential effect on the interested person and any future action to which that person may be a party.

Of course, any given action may present circumstances in which this formula does not apply. For example, in *Hilton* v. *New Haven*, supra, 233 Conn. 723, in which the plaintiffs challenged a city's housing policies based on an alleged state constitutional right to shelter, this court concluded that, "[g]iven the importance of the constitutional claims raised and the significant ramifications for the state of a conclusion by this court that the state has an affirmative constitutional duty to provide its citizens with shelter," the state was "an indispensable party that should have been afforded an opportunity to participate in the proceedings at the trial level." This court nevertheless declined to remand the action because the state had participated in the appeal as an amicus curiae and had been a party in a companion case that was dispositive of the claims in *Hilton*.

In the present case, we do not perceive circumstances that require the remand of the action in order to allow notice and the possible participation of any absent interested persons. The parties argued their respective legal positions competently and, in particular, those interested in defending the statute's constitutionality, such as other governmental entities or health advocacy organizations, are represented adequately by the efforts of the attorney general and the amicus curiae, the American Cancer Society, Inc. We perceive no impairment in our ability to consider this purely legal question—whether the smoking ban violates equal protection principles—and, therefore, we now proceed to consider the merits of the appeal.

## II

The specific question before us is whether the trial court properly granted the defendants' motion to strike based on its conclusion that the legislature's failure to impose the smoking ban on casinos and private clubs did not result in a violation of the equal protection rights of the plaintiffs, who are owners of restaurants and cafés that are subject to the ban. The plaintiffs contend that the legislation violates the mandates of equal protection because it bans smoking in restaurants and cafés without banning smoking in casinos and private clubs, and this unequal treatment, the plaintiffs contend, does not bear a rational relationship to a legitimate public interest. Specifically, the plaintiffs claim that, although the stated purpose of the ban was to remove secondhand smoke from workplaces, the ban was imposed on certain businesses, and not others, based on the type of liquor permit issued to the business, and this, the plaintiffs argue, bears no relationship to the nature of the workplace conditions. Because casinos and private clubs are not distinguishable from restaurants and cafés in terms of their workplace conditions, the plaintiffs assert, the legislature's

unequal treatment of these establishments violates equal protection principles. The plaintiffs further assert that the legal status of private clubs as "private," as opposed to "public," does not serve as a rational basis for different treatment because, the plaintiffs contend, they are as accessible to the public as are public establishments. The plaintiffs also contest the trial court's conclusion that the legislature rationally could exempt casinos from the smoking ban because of concerns about the enforceability of the ban at the casinos. The plaintiffs argue that the casinos expressly are subject to state law, and the legislature previously has passed legislation regulating the casinos. Thus, the plaintiffs claim, any concerns about enforceability do not constitute a rational basis for exempting casinos from the smoking ban. Finally, the plaintiffs aver that the state and federal equal protection clauses do not permit the legislature to exempt casinos from the smoking ban because of anticipated difficulty in passing the legislation if casinos were to be included.

The defendants respond that the trial court properly determined that the legislature's decision to exempt casinos and private clubs from the smoking ban was supported by a rational basis. Specifically, the defendants argue that exempting private clubs from the ban is justified by the fact that such clubs are distinguishable from restaurants and cafés because state statutes provide that they are not open to the public and because the members of the club may have joined the club and paid their membership fees with the expectation that they would be able to smoke in the club facility. Moreover, the defendants contend, the exemption for casinos also satisfies rational basis review because the legislature reasonably could have chosen to exempt the casinos due to concern about the state's ability to enforce the legislation against the Indian tribes that own the casinos or out of sensitivity for the tribes' sovereign

status and the tribes' economic and political relationships with the state, which result in millions of dollars a year in additional revenue for the state. We agree with the defendants and affirm the judgment of the trial court.

We first set forth the applicable standard of review. "A motion to strike challenges the legal sufficiency of a pleading . . . and, consequently, requires no factual findings by the trial court. As a result, our review of the court's ruling is plenary. . . . We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . [I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . Thus, we assume the truth of both the specific factual allegations and any facts fairly provable thereunder. In doing so, moreover, we read the allegations broadly . . . rather than narrowly." (Internal quotation marks omitted.) *Greco* v. *United Technologies Corp.*, 277 Conn. 337, 347, 890 A.2d 1269 (2006).

"It is well established that when a [party's] claims involve a question of law, we review them de novo." (Internal quotation marks omitted.) *State* v. *Vakilzaden*, 272 Conn. 762, 768–69, 865 A.2d 1155 (2005). The plaintiffs challenge the constitutionality of the smoking ban statute, thus raising a question of law that is subject to plenary review by this court. The plaintiffs specifically allege that the statute violates the equal protection clauses of the state and federal constitutions.[9] "[I]n

[9] The plaintiffs acknowledge that this court has interpreted the state constitution's equal protection clause to "have a like meaning and [to] impose similar constitutional limitations" as the federal equal protection clause. See *Horton* v. *Meskill*, 172 Conn. 615, 639, 376 A.2d 359 (1977). The plaintiffs provided no separate analysis of their state constitutional claim and, accordingly, we consider the issue pursuant to federal equal protection principles. See *State* v. *Sinvil*, 270 Conn. 516, 518 n.1, 853 A.2d 105 (2004) (court will not entertain state constitutional claim unless separately briefed and analyzed).

general, as in any constitutional challenge to the validity of a statutory scheme, the [statutory scheme] is presumed constitutional . . . and [t]he burden is on the [party] attacking the legislative arrangement to negative every conceivable basis which might support it . . . ." (Internal quotation marks omitted.) *State* v. *Long*, 268 Conn. 508, 534, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004).

"When a statute is challenged on equal protection grounds . . . the reviewing court must first determine the standard by which the challenged statute's constitutional validity will be determined. If, in distinguishing between classes, the statute either intrudes on the exercise of a fundamental right or burdens a suspect class of persons, the court will apply a strict scrutiny standard [under which] the state must demonstrate that the challenged statute is necessary to the achievement of a compelling state interest. . . . If the statute does not touch upon either a fundamental right or a suspect class, its classification need only be rationally related to some legitimate government purpose in order to withstand an equal protection challenge." (Internal quotation marks omitted.) *Harris* v. *Commissioner of Correction*, 271 Conn. 808, 831, 860 A.2d 715 (2004). In the present case, the parties concede, and we agree, that the challenged legislation does not implicate a fundamental right or a suspect class and, thus, is subject to review for a rational relationship to a legitimate government purpose.

"[T]he analytical predicate [of consideration of an equal protection claim] is a determination of who are the persons similarly situated." (Internal quotation marks omitted.) Id. We assume, without deciding, that restaurants and cafés are situated similarly to casinos and private clubs with respect to the statutory scheme in order to proceed with the equal protection analysis. See *State* v. *Wright*, 246 Conn. 132, 143, 716 A.2d 870

(1998) (court frequently has assumed, for purpose of proceeding with equal protection analysis, that categories of defendants are similarly situated with respect to challenged statute).

To sustain the present legislation, we need not agree with the legislature's decision to exempt casinos and private clubs from the smoking ban. "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." (Internal quotation marks omitted.) *Harris* v. *Commissioner of Correction*, supra, 271 Conn. 834. "Rational basis review is satisfied so long as there is a plausible policy reason for the classification . . . . [I]t is irrelevant whether the conceivable basis for the challenged distinction actually motivated the legislature." (Internal quotation marks omitted.) *State* v. *Long*, supra, 268 Conn. 535. To succeed, the party challenging the legislation must "negative every conceivable basis which might support it . . . ." (Internal quotation marks omitted.) *Federal Communications Commission* v. *Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993).

A

We agree with the defendants that it is possible to conceive of plausible policy reasons for exempting casinos and private clubs from the smoking ban legislation. We consider first private clubs, which hold a legal status that is different from restaurants and cafés. General Statutes §§ 30-23[10] and 30-

---

[10] General Statutes § 30-23 provides: "(a) A club permit shall allow the retail sale of alcoholic liquor to be consumed on the premises of a club but only by members or their guests. The annual fee for a club permit shall be two hundred forty dollars.

23a[11] impose restrictions on private clubs to which res-

"(b) 'Club' means an association of persons, whether incorporated or unincorporated, which has been in existence as a bona fide organization for at least three years prior to applying for a permit issued as provided by this chapter, or has been a bona fide national or international fraternal or social organization or affiliation thereof which has been in existence in this state for one year, for the promotion of some common object, not including associations organized for any commercial or business purpose the object of which is money profit, owning, hiring or leasing a building, or space in a building, or having substantial control of a building or space therein, of such extent and character as, in the judgment of the department, may be suitable and adequate for the reasonable and comfortable use and accommodation of its members and their guests; provided, as to such clubs as the department finds to be bona fide and which offer facilities and privileges in addition to the privileges of the club building, such as golf, tennis, bathing or beach facilities, hunting or riding, the three-year requirement shall not apply; and provided such club shall file with the department, upon request, within ten days of February first in each year, a list of the names and residences of its members, and shall similarly file, within ten days of the election of any additional member, his name and address, and provided its aggregate annual membership fees or dues and other income, exclusive of any proceeds of the sale of alcoholic liquor, shall be sufficient to defray the annual rental of its leased or rented premises, or, if such premises are owned by the club, shall be sufficient to meet the taxes, insurance and repairs and the interest on any mortgage thereof; and provided, further, its affairs and management shall be conducted by a board of directors, executive committee or similar body chosen by the members at their annual meeting, and no member or any officer, agent or employee of the club shall be paid or, directly or indirectly, shall receive in the form of salary or other compensation any profits from the disposition or sale of alcoholic liquor to the club or to the members of the club or its guests introduced by members, beyond the amount of such salary as may be fixed and voted at annual meetings by the members or by its directors or other governing body and as reported by the club to the department, within three months after such annual meeting, and as, in the judgment of the department, is reasonable and proper compensation for the services of such member, officer, agent or employee.

"(c) A nonprofit club permit shall allow the retail sale of alcoholic liquor to be consumed on the premises of a nonprofit club by members or their guests and by persons other than members or their guests, provided the total receipts of such club in any year, including receipts from the sale of alcoholic liquor, derived from making its facilities and services available to such persons in furtherance of such club's recreational or other nonprofit purpose shall not exceed fifteen per cent of such club's gross receipts for such year. 'Nonprofit club' means a club that is exempt from federal income tax under Section 501(a) of the Internal Revenue Code and is described in Section 501(c) of the code. The annual fee for a nonprofit club permit shall be six hundred fifty dollars."

[11] General Statutes § 30-23a provides: "No person shall be construed to be a guest of a member of a club within the intent of section 30-23 or of a

taurants and cafés are not subject. Section 30-23 (a) limits the consumption of alcohol at clubs to members or their guests and § 30-23 (b) further requires that the club annually file with the department of consumer protection a list of members, updating the filing within ten days of the election of a new member. Section 30-23a provides that the inviting member must sign and date the club's guest book after having entered the name and address of the guest, and that this function of listing the guest's name may not be performed by the permittee or a person employed by the club to serve alcohol. Within the context of these legal restrictions, members of private clubs generally pay a membership fee with the expectation that they will be able to maintain their privacy and establish such conditions for the operation of the club that suit the needs and desires of the majority of the membership.

The legislature reasonably could have considered that among the conditions over which private club members may expect to exercise control is the regulation of smoking within the club facility. This consideration could have led the legislature to conclude that the imposition of a smoking ban on private clubs would upset unfairly this expectation of club members, as well as the financial investment upon which their expectation is based, and that this deprivation of the members' settled expectations would constitute an injustice that would outweigh any benefit to be derived from impos-

golf country club within the intent of section 30-24a until his name and address has been entered in the guest book maintained for such purposes on the club or golf country club premises, together with the signature of the member and the date of introduction, provided neither the permittee nor any person employed to dispense alcoholic beverages on such premises, during his working hours on such premises, shall enter such person's name in such book. The requirement of this section may be waived by the Department of Consumer Protection on special occasions upon written application."

ing the ban on such private facilities.[12] Although the

---

[12] The dissent repeatedly argues that the record lacks evidence demonstrating that a reasonable expectation of control arises from membership in a private club. Thus, the dissent contends, any attempt by the legislature to protect such an expectation by exempting existing private clubs from the smoking ban would have been the improper product of speculation or unsupported legislative fact-finding.

We disagree for two reasons. First, this argument ignores the nature of the source from which such a legislative conclusion flows. Specifically, a conclusion that private club members possess an expectation of privacy and control over their club arises directly from the law that governs such clubs. State law permits private clubs to elect a board of members to direct its affairs and to impose fees or dues to offset its expenses. The law not only assumes, but actually requires, that such clubs remain private, limiting their service of alcohol only to members and their invited guests who must be listed on the club's guest book by the signing member. Private clubs are further required to maintain and file with the state a current list of members. See footnotes 10 and 11 of this opinion. The statute makes clear that private clubs may not serve the public at large without violating the law. These statutory provisions would allow the legislature reasonably to conclude that members of private clubs enjoy an expectation of privacy and control over the operation of the club as a result of that membership. The statutes themselves justify such a conclusion; no further evidence or legislative fact-finding is necessary. Moreover, whether the legislature actually reached this conclusion is irrelevant to our analysis because rational basis review requires us to uphold the legislation "if there is any *reasonably conceivable* state of facts that could provide a rational basis for the classification." (Emphasis added; internal quotation marks omitted.) *Harris* v. *Commissioner of Correction*, supra, 271 Conn. 834.

We also disagree because of the standard of review and burden of proof applicable to such constitutional challenges. The United States Supreme Court has made clear that rational basis review is to be applied broadly, with great deference to legislative authority. "In the area of economics and social welfare, a [s]tate does not violate the [e]qual [p]rotection [c]lause merely because the classifications made by its laws are imperfect. If the classification has some reasonable basis it does not offend the [c]onstitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality." (Internal quotation marks omitted.) *United States Railroad Retirement Board* v. *Fritz*, 449 U.S. 166, 175, 101 S. Ct. 453, 66 L. Ed. 2d 368 (1980). Even if the dissent were justified in complaining that the record does not establish that the smoking ban would impose a greater injury on private club members than on owners of restaurants and cafés, equal protection law dictates that "[i]t is not the function of the court to alter a legislative policy merely because it produces unfair results." *Ecker* v. *West Hartford*, 205 Conn. 219, 241, 530 A.2d 1056 (1987); see *Federal Communications Commission* v. *Beach Communica-*

legislature need not actually have been motivated by this policy consideration in order for this court to uphold the statute on that basis; see *State* v. *Long*, supra, 268 Conn. 535; our supposition that the legislature may have been so motivated is supported by the legislature's decision to exempt from the smoking ban only those private clubs that had obtained their liquor permits prior to the effective date of the legislation.[13] This decision to exempt existing private clubs from the smoking ban, while imposing the ban on new private clubs, is consistent with our conclusion that the legislature reasonably may have been endeavoring to protect the financial investment and settled expectations of members of private clubs. We conclude that this policy consideration constitutes a rational basis for the legislature's decision to exempt existing private clubs from the smoking ban imposed on restaurants and cafés.[14]

---

*tions, Inc.*, supra, 508 U.S. 314 ("[t]he [c]onstitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted" [internal quotation marks omitted]). The applicable standard of review strongly favors constitutionality.

The burden of proof in constitutional challenges also strongly supports upholding the legislation. As we have stated on numerous occasions, "[t]he party claiming a constitutional violation bears the heavy burden of proving that the challenged policy has no reasonable relationship to *any* legitimate state purpose . . . ." (Emphasis in original; internal quotation marks omitted.) *State* v. *Moran*, 264 Conn. 593, 615, 835 A.2d 895 (2003). "Legislation is presumed to be constitutional, and a litigant challenging its validity has the heavy burden to establish its unconstitutionality beyond a reasonable doubt." *Stafford Higgins Industries, Inc.* v. *Norwalk*, supra, 245 Conn. 566. In the present case, the plaintiffs have failed to bear the burden of establishing beyond a reasonable doubt the irrationality of a legislative conclusion that members of existing private clubs possess an expectation of control and privacy that justifies exempting such clubs from the smoking ban.

[13] General Statutes § 19a-342 (b) (1) provides in relevant part that "no person shall smoke . . . (E) . . . in any area of an establishment with a permit for the sale of alcoholic liquor pursuant to section 30-23 issued after May 1, 2003 . . . ."

[14] The dissent argues that concern for the expectations and investments of private club owners reasonably may not have influenced the legislature because it is unrelated to the object of the legislation, which the dissent

In support of their challenge to the exemption for private clubs, the plaintiffs rely upon two decisions by

defines as the protection of employees from secondhand smoke. Having thus narrowly defined the purpose of the legislation, the dissent casts the exemption for private clubs as lacking a rational relationship to that narrow purpose and, therefore, as a violation of equal protection.

We acknowledge that this court in prior cases has used language indicating that a classification must bear a rational relationship to the "purpose" or "object" of the legislation, using these terms in the singular, and thereby perhaps implying that legislation generally possesses a single, identifiable primary purpose, and that a classification is proper only if it serves the legislation's primary purpose. See, e.g., *Blue Sky Bar, Inc.* v. *Stratford,* 203 Conn. 14, 28–29, 523 A.2d 467 (1987) ("classifications must be based on natural and substantial differences, germane to the subject and purpose of the legislation" [internal quotation marks omitted]); *Daily* v. *New Britain Machine Co.,* 200 Conn. 562, 578, 512 A.2d 893 (1986) (classification "must rest upon some ground of difference having a fair and substantial relation to the object of the legislation" [internal quotation marks omitted]). We note, however, that we often have used language, sometimes in the very same cases, that supports a contrary implication, i.e., that legislation often embodies multiple purposes and that a classification will withstand rational basis review if it bears a rational relationship to *any* legitimate state end. See, e.g., *Donahue* v. *Southington,* 259 Conn. 783, 795, 792 A.2d 76 (2002) ("classification and disparate treatment inherent in a statute [must] bear a rational relationship to a legitimate state end and [be] based on reasons related to the accomplishment of that goal"); *Zapata* v. *Burns,* 207 Conn. 496, 507, 542 A.2d 700 (1988) (same); *Blue Sky Bar, Inc.* v. *Stratford,* supra, 26–27 (same); *Daily* v. *New Britain Machine Co.,* supra, 577 (same).

We take this opportunity to disavow any implication arising from past cases that a statutory classification must be rationally related to the statute's primary purpose in order to survive an equal protection challenge. As the United States Supreme Court has made clear, "social and economic legislation is valid unless the varying treatment of different groups or persons is so unrelated to the achievement of *any combination of legitimate purposes* that [a court] can only conclude that the legislature's actions were irrational." (Emphasis added; internal quotation marks omitted.) *Hodel* v. *Indiana,* 452 U.S. 314, 332, 101 S. Ct. 2376, 69 L. Ed. 2d 40 (1981); see also *Federal Communications Commission* v. *Beach Communications, Inc.,* supra, 508 U.S. 313–14 (under rational basis review, "[w]here there are plausible reasons for [legislature's] action, our inquiry is at an end" [internal quotation marks omitted]). A statutory classification will survive rational basis review pursuant to the equal protection clauses of the state and federal constitutions if the purpose of that classification is rationally related to any legitimate public interest, even if that interest does not serve as the primary motivating interest for the legislation in which the classification is found. See *Coalition for Equal Rights, Inc.* v. *Owens,* 458 F. Sup. 2d 1251, 1260 (D. Colo. 2006) (reviewing United States Supreme Court precedent and concluding that "prevailing authority all supports the basic conclusion that legislatures have broad discretion to make economic and social distinctions in pursuit of valid public policy goals, and courts may strike such legislation only if

trial courts in other states. First, the plaintiffs cite a decision by a Rhode Island trial court granting a temporary restraining order that prevented, on equal protection grounds, the enforcement of a smoking ban that exempted private clubs. *Club 2000, Inc.* v. *Rhode Island*, Superior Court, Docket No. 05-135 (March 31, 2005). Subsequent to the court's decision, the Rhode

the distinctions are irrational and completely unrelated to any conceivable policy goal").

The dissent's focus on a statute's primary purpose ignores the fact that the legislative process requires lawmakers to consider many public interests as they strive to achieve a particular legislative end. Attempts to balance differing public policies and interests are found throughout our body of statutory law. See, e.g., General Statutes § 1-210 (b) (certain public records exempt from disclosure requirements of Freedom of Information Act); *Rice* v. *Vermilyn Brown, Inc.*, 232 Conn. 780, 789 n.14, 657 A.2d 616 (1995) (five year limitation period of Workers' Compensation Act reflects balancing of injured worker's interest in compensation and employer's interest in finite period of exposure to compensation claims); *State* v. *McVeigh*, 224 Conn. 593, 611, 620 A.2d 133 (1993) (wiretap legislation enacted as necessary tool for law enforcement but narrowly drawn to protect individual liberties). As we recently noted in *State* v. *Skakel*, 276 Conn. 633, 686, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006), criminal statutes of limitations represent a balancing of the state's interest in justice and an individual's interest in being "free from the continual threat of prosecution for past misconduct." (Internal quotation marks omitted.) We therefore view the legislative product broadly, and deferentially, in undertaking rational basis review.

This is consistent with our past practice. In *Daily* v. *New Britain Machine Co.*, supra, 200 Conn. 575, the plaintiffs contended that the product liability statute of limitations, General Statutes § 52-577a, violated equal protection because employees were barred from suit after ten years and nonemployees were permitted to sue for the useful life of the product. This court upheld the classification, noting that the statute of limitations was enacted in response to manufacturers' increased difficulty obtaining insurance; id., 578; and that the classifications were a "trade-off" that reasonably balanced the individual right to recovery and the manufacturers' responsibility for their goods. Id., 581.

Similarly, in *Blue Sky Bar, Inc.* v. *Stratford*, supra, 203 Conn. 29, the court rejected the equal protection claim that a Stratford town ordinance banning ice cream trucks irrationally distinguished between motorized vendors and mobile nonmotorized vendors. This court concluded that the town council reasonably could have determined that "vending from nonmotor vehicles . . . presents less of an overall safety hazard to children than vending from motor vehicles." Id.; see also *Gentile* v. *Altermatt*, 169 Conn. 267, 295–98, 363 A.2d 1 (1975) (upholding statutory classification in no-fault motor vehicle insurance act), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976).

Island legislature amended the statute to eliminate the exemption. The trial court's order provides no reasoning for its decision to grant the restraining order and thus is of little persuasive value.

The plaintiffs also rely upon a Maryland decision, *Anchor Inn Seafood Restaurant* v. *Montgomery County Council,* Circuit Court for Montgomery County, Maryland, Docket No. 199692 (June 20, 2000), aff'd on other grounds, *Montgomery County* v. *Anchor Inn Seafood Restaurant,* 374 Md. 327, 822 A.2d 429 (2003), in which the trial court struck down a county ordinance that banned smoking in restaurants and bars, but not in private clubs, as a violation of equal protection.[15] The trial court in that case was not persuaded by the defendant's argument that the exemption was justified because private clubs are nonprofit entities, concluding that "[a]lthough a non-profit entity may be treated differently for tax purposes, it is subject to the same health and safety regulations." Id., p. 11. This reasoning is not relevant to our current inquiry because, under Connecticut law, a private club is not necessarily a nonprofit organization, and the smoking ban exemption for private clubs does not distinguish based on the clubs' status in this regard. See General Statutes §§ 30-23 (c) and 19a-342 (b) (1) (E). The court in *Anchor Inn Seafood Restaurant* does not appear to have considered other differences between private clubs and public facilities, such as the members' financial investment and concomitant expectations, which we find to constitute sufficient justification for the exemption. For these reasons, we find this case also unpersuasive.[16]

---

[15] The Maryland Court of Appeals subsequently affirmed the trial court's decision on other grounds, without reaching the equal protection issue. See *Montgomery County* v. *Anchor Inn Seafood Restaurant,* supra, 374 Md. 327.

[16] The dissent emphasizes that the trial court in *Anchor Inn Seafood Restaurant* struck down the classification of public and private establishments because that distinction was not relevant to the public health purpose of the statute. We reject this reasoning of the Maryland trial court because, like the dissent in the present case, the court failed to acknowledge the

## B

We consider next whether a rational basis exists for the exemption of casinos from the ban. Like private clubs, casinos also hold a different legal status from restaurants and cafés. Connecticut casinos are located on Indian reservations and are operated by the Mashantucket Pequot and Mohegan tribes pursuant to gaming compacts between the state and the tribes. See 56 Fed. Reg. 24,996 (May 31, 1991); Opinions, Conn. Atty. Gen. No. 98-013 (July 31, 1998); *Kizis* v. *Morse Diesel International, Inc.*, 260 Conn. 46, 54–55, 794 A.2d 498 (2002). The tribes possess sovereignty rights over activities on tribal lands, and the state's power to regulate such activities is limited by federal law and, in the case of casino operations, the terms of the gaming compacts. See General Statutes § 47-59a; Opinions, Conn. Atty. Gen., supra, No. 98-013; *Kizis* v. *Morse Diesel International, Inc.*, supra, 53 ("[t]he exercise of tribal governing power may . . . preempt state law in areas where, absent tribal legislation, state law might otherwise apply" [internal quotation marks omitted]). The state's ability to enforce a regulatory law that affects a casino on a reservation may be limited by the terms of the relevant compact or may be preempted by federal law. When considering whether a state law concerning liquor regulation may

legislature's power to balance competing interests by exempting certain entities from regulatory obligations for reasons unrelated to the statute's primary objective. Moreover, as we previously have stated, the trial court in *Anchor Inn Seafood Restaurant* limited its rational basis review to the fact that, under Maryland tax law, private facilities are nonprofit entities and public facilities are operated for profit, finding this difference insufficient to justify exempting the private facilities from the smoking ban. See *Anchor Inn Seafood Restaurant* v. *Montgomery County Council*, supra, Circuit Court, Docket No. 199692, p. 11. The court did not consider the difference that we find persuasive, namely, that the statutory provisions governing private clubs have given rise to privacy and investment expectations that the legislature rationally could have sought to protect. Because the court in *Anchor Inn Seafood Restaurant* failed to consider this difference, which we find significant, the case further fails to influence our reasoning.

be applied on a reservation, the United States Supreme Court has indicated that it considers whether "such application would interfere with reservation self-government or would impair a right granted or reserved by federal law." (Internal quotation marks omitted.) *Rice* v. *Rehner*, 463 U.S. 713, 718, 103 S. Ct. 3291, 77 L. Ed. 2d 961 (1983). Moreover, the Supreme Court made this determination with due consideration of "the particular notions of sovereignty that have developed from historical traditions of tribal independence." (Internal quotation marks omitted.) Id., 719. Thus, limitations on the state's power to regulate smoking in casinos may arise from multiple sources, namely, the terms of the gaming compact, federal law, or state deference to tribal sovereignty. In contrast, the state is not limited by any of these concerns in its regulation of restaurants and cafés.

The plaintiffs contend that the state possesses the power to regulate smoking in the casinos because the gaming compacts do not forbid the exercise of that power and regulation that impacts only the casinos does not implicate tribal sovereignty. The precedent of the United States Supreme Court makes clear, however, that determination of the legislature's power to impose a particular regulation on a tribal entity requires a balancing of factors.

Moreover, even if the legislature held such power, it may encounter difficulty in the ability to enforce such a ban. The case of *Dept. of Taxation & Finance of New York* v. *Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 114 S. Ct. 2028, 129 L. Ed. 2d 52 (1994), and the proceedings that followed from it, are illustrative. In that case, the United States Supreme Court upheld the power of the state of New York to impose certain regulations on the sale of cigarettes on tribal land. Nevertheless, the state of New York declined to enforce the regulations and eventually repealed them. In an action brought by other tobacco sellers seeking to force New York to enforce

the regulations, an appeals court determined that the state's decision not to do so survived rational basis review because "the statutes cannot effectively be enforced without the cooperation of the Indian tribes." *New York Assn. of Convenience Stores* v. *Urbach*, 275 App. Div. 2d 520, 522, 712 N.Y.S.2d 220 (2000). The court specifically noted the legal difficulties faced by the state in its enforcement efforts against the tribes. "Because of tribal immunity, the retailers cannot be sued for their failure to collect the taxes in question, and [s]tate auditors cannot go on the reservations to examine the retailers' records. Additionally, the [department of taxation and finance (department)] cannot compel the retailers to attend audits off the reservations or compel production of their books and records for the purpose of assessing taxes. In that regard, representatives of the [d]epartment engaged in extensive negotiations with the tribes in an effort to arrive at an acceptable agreement. Those efforts were largely unsuccessful and the vast majority of the Indian retailers refused to register with the [d]epartment. In further efforts to enforce the statute, the [s]tate attempted interdiction, i.e., interception of tobacco and motor fuel shipments and seizure of those shipments that were found to be in noncompliance with the [t]ax [l]aw. That strategy resulted in civil unrest, personal injuries and significant interference with public transportation on the [s]tate highways." Id., 522–23. Although we do not speculate that this state would face such difficulties if it were to attempt to impose and enforce the smoking ban in the casinos, we find the difficulties faced by New York to be illustrative of the way in which tribal sovereignty can complicate state efforts to impose regulation on the tribes, even when the state clearly holds the legal power to do so.[17]

---

[17] The dissent contends that an opinion issued by the attorney general subsequent to the enactment of the legislation makes "perfectly clear" that the state has the power to impose the smoking ban on the casinos. Even if that were true, the degree to which it is clear that a legislature possesses

We conclude that these uncertainties concerning the legislature's power to regulate, as well as the state's ability to enforce such a regulation, are sufficient to provide a rational basis for the legislature's decision to exempt the casinos from the ban. Moreover, we note that the legislature also rationally could have declined to impose the smoking ban on the casinos out of respect for the tribes' sovereignty or out of sensitivity to the economic and political relationships between the tribes and the state. The tribes hold legal status as sovereign nations, and they are partners in an economic arrangement with the state that provides the state coffers with a significant source of income. The legislature could have concluded, as a matter of public policy, that efforts to protect employees and others from secondhand smoke at the casinos are best pursued through voluntary efforts or negotiation and that, as valuable as such protections are, their benefits would be outweighed by the potential damage to the state's relationship with

the power to pass legislation does not determine whether the legislature rationally may decline to enact that legislation over fears that its enforcement will be resisted. See *New York Assn. of Convenience Stores* v. *Urbach*, supra, 275 App. Div. 2d 521–23 (state's refusal to enforce regulations survived rational basis review because of enforcement difficulties arising from tribal sovereignty, despite fact that United States Supreme Court unequivocally had held that state possessed authority to enact regulations).

The dissent further claims that, because the tribes have not interfered with the state's enforcement of liquor and revenue laws pursuant to the gaming compacts, any legislative concern that the tribes would resist enforcement of the smoking ban is irrational. We disagree. The legislature rationally could fear that a new category of regulation imposed without negotiation or consent, unlike the gaming compacts, may arouse resentment and, possibly, resistance and legal challenges on the part of the tribes.

Moreover, the fact that the attorney general may have expressed his opinion that such regulation is lawful does not bind either the legislature or a future court to the same conclusion. *Wiseman* v. *Armstrong*, 269 Conn. 802, 825, 850 A.2d 114 (2004) (attorney general opinion, while highly persuasive, not binding on court). Given the sensitive and careful analysis required to determine whether regulation of activities on tribal lands is permissible; see *Rice* v. *Rehner*, supra, 463 U.S. 718–19; the legislature would have been justified in concluding that the legality of such regulation was not certain, absent a judicial determination of the issue.

the tribes should the state attempt to impose a smoking ban on the casinos without the tribes' consent.

Thus, we conclude that the legislature reasonably could have determined that the legal status of the casinos differs significantly from that of restaurants and cafés and that this difference provides a rational basis for exempting them from the smoking ban legislation.[18]

We therefore determine that § 19a-342 withstands the plaintiffs' constitutional challenge on equal protection grounds.

The judgment is affirmed.

In this opinion NORCOTT, KATZ and ZARELLA, Js., concurred.

SULLIVAN, C. J., dissenting. I agree with the majority that the trial court had subject matter jurisdiction over this case despite the plaintiffs' failure to provide notice to all interested persons as required by Practice Book § 17-56 (b).[1] I disagree, however, that Public Acts 2003, No. 03-45 (P.A. 03-45), which amended General Statutes § 19a-342[2] to prohibit smoking in restaurants, cafés and certain other public facilities, but not in casinos and most private clubs, passes constitutional muster under

---

[18] We note that, in the only other case in which, to our knowledge, a court has considered an equal protection challenge to the exemption of casinos from a smoking ban, the court concluded that economic considerations were sufficient to satisfy rational basis review. See *Coalition for Equal Rights, Inc.* v. *Owens*, 458 F. Sup. 2d 1251, 1260–61 (D. Colo. 2006) (no equal protection violation where exemption of casinos from smoking ban based on concerns about loss of revenue to state and economic impact on small towns in which casinos located).

[1] The plaintiffs, Diane Batte-Holmgren, Gina MacDonald, John Woermer and Irving Nielsen, are owners of businesses affected by legislation banning smoking in restaurants, cafés and certain public areas.

[2] See footnote 3 of the majority opinion for the text of § 19a-342.

the equal protection clauses of the state and federal constitutions.[3] Accordingly, I dissent.

In determining whether legislation complies with principles of equal protection, this court consistently has held that "[t]he relevant inquiry is whether the classification and disparate treatment inherent in the statute of repose legislation bears a rational relationship to a legitimate state end and is based on reasons related to the accomplishment of that goal. . . . [T]he [f]ourteenth [a]mendment does not deny to [s]tates the power to treat different classes of persons in different ways. . . . The equal protection clause of that amendment does, however, deny to [s]tates the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." (Citations omitted; internal quotation marks omitted.) *Daily* v. *New Britain Machine Co.*, 200 Conn. 562, 577–78, 512 A.2d 893 (1986). For more than seventy-five years, this court has recognized that "classifications must be based on natural and substantial differences, germane to the subject and purpose of the legislation, between those within the class included and those whom it leaves untouched." (Internal quotation marks omitted.) *Blue Sky Bar, Inc.* v. *Stratford,* 203 Conn. 14, 28–29, 523 A.2d 467 (1987); see also *State* v. *Moran,* 264 Conn. 593, 608, 825 A.2d 111 (2003); *Rayhall* v. *Akim Co.,* 263 Conn. 328, 346, 819 A.2d 803 (2003);

[3] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

Article first, § 20, of the constitution of Connecticut provides in relevant part: "No person shall be denied the equal protection of the law . . . ."

*Donahue* v. *Southington,* 259 Conn. 783, 795, 792 A.2d
76 (2002); *Barton* v. *Ducci Electrical Contractors, Inc.,*
248 Conn. 793, 814, 730 A.2d 1149 (1999); *Johnson* v.
*Meehan,* 225 Conn. 528, 536, 626 A.2d 244 (1993); *Circuit-Wise, Inc.* v. *Commissioner of Revenue Services,*
215 Conn. 292, 301, 576 A.2d 1259 (1990); *Zapata* v.
*Burns,* 207 Conn. 496, 509–14, 542 A.2d 700 (1988);
*Ecker* v. *West Hartford,* 205 Conn. 219, 239 n.13, 530
A.2d 1056 (1987); *Daily* v. *New Britain Machine Co.,*
supra, 577; *Eielson* v. *Parker,* 179 Conn. 552, 566, 427
A.2d 814 (1980); *Caldor's, Inc.* v. *Bedding Barn, Inc.,*
177 Conn. 304, 315, 417 A.2d 343 (1979); *Halabi* v.
*Administrator, Unemployment Compensation Act,*
171 Conn. 316, 322, 370 A.2d 938 (1976); *Gentile* v.
*Altermatt,* 169 Conn. 267, 295, 363 A.2d 1 (1975), appeal
dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631
(1976); *Tough* v. *Ives,* 162 Conn. 274, 293, 294 A.2d
67 (1972); *St. John's Roman Catholic Church Corp.* v.
*Darien,* 149 Conn. 712, 723–24, 184 A.2d 42 (1962);
*Schwartz* v. *Kelly,* 140 Conn. 176, 181, 99 A.2d 89, appeal
dismissed, 346 U.S. 891, 74 S. Ct. 227, 98 L. Ed. 394
(1953); *Francis* v. *Fitzpatrick,* 129 Conn. 619, 623, 30
A.2d 552 (1943); *State* v. *Cullum,* 110 Conn. 291, 295,
147 A. 804 (1929). This understanding of the constraints
that the fourteenth amendment places on state legislatures is nearly as old as the amendment itself. See, e.g.,
*Gulf, Colorado & Santa Fe Railway Co.* v. *Ellis,* 165 U.S.
150, 155, 17 S. Ct. 255, 41 L. Ed. 666 (1897) (legislative
classifications "must always rest upon some difference
which bears a reasonable and just relation to the act
in respect to which the classification is proposed").

This court also has recognized that a core purpose
of the constitutional guarantee of equal protection is
to prevent lawmakers from shielding the politically
powerful from legislative burdens that have been
imposed on other groups that are similarly situated, but
politically weak. "[N]othing opens the door to arbitrary

action so effectively as to allow [government] officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected." (Internal quotation marks omitted.) *Wagner v. Connecticut Personnel Appeal Board*, 170 Conn. 668, 673, 368 A.2d 20 (1976). Indeed, the very essence of law, as distinct from arbitrary power, is that its burdens are generally shared, and are not selectively imposed on those who have the least power to resist.[4]

The majority now concludes that "legislation often embodies multiple purposes" and that it must "disavow any implication . . . that a statutory classification must be rationally related to the statute's *primary* purpose in order to survive an equal protection challenge." (Emphasis added.) See footnote 14 of the majority opinion. I agree that statutory schemes frequently attempt to balance the various interests of the persons and classes of persons that are affected by the scheme, and that a statutory classification that is rationally related to the protection or advancement of any of these inter-

---

[4] "It is not every act, legislative in form, that is law. Law is something more than mere will exerted as an act of power. It must be not a special rule for a particular person or a particular case, but . . . the general law . . . so that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society, and thus excluding, as not due process of law . . . [all] special, partial and arbitrary exertions of power under the forms of legislation. Arbitrary power, enforcing its edicts to the injury of the persons and property of its subjects, is not law, whether manifested as the decree of a personal monarch or of an impersonal multitude. And the limitations imposed by our constitutional law upon the action of the governments, both [s]tate and national, are essential to the preservation of public and private rights, notwithstanding the representative character of our political institutions. The enforcement of these limitations by judicial process is the device of self-governing communities to protect the rights of individuals and minorities, as well against the power of numbers, as against the violence of public agents transcending the limits of lawful authority, even when acting in the name and wielding the force of the government." (Internal quotation marks omitted.) *Hurtado v. California*, 110 U.S. 516, 535–36, 4 S. Ct. 111, 28 L. Ed. 232 (1884).

ests will pass constitutional muster. It is clear, for example, that the Workers' Compensation Act, General Statutes § 31-275 et seq., attempts to advance the interests of employees in obtaining prompt and fair compensation for their work-related injuries while simultaneously protecting employers by precluding other causes of action against them and limiting the amount of the employee's recovery. See *Mello* v. *Big Y Foods, Inc.*, 265 Conn. 21, 26, 826 A.2d 1117 (2003) (workers' compensation "statutes compromise an employee's right to a common law tort action for work related injuries in return for relatively quick and certain compensation"). I also recognize that it is not inconsistent with equal protection principles for the legislature to take " 'one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.' " *Federal Communications Commission* v. *Beach Communications, Inc.*, 508 U.S. 307, 316, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993). A statutory provision that exempts a particular class of persons because subjecting it to the statute would not appreciably advance the purpose of the legislation *is* related to the statutory purpose. The majority has failed, however, to explain how the legislative classification created by P.A. 03-45 advances *any* purpose *of the statute.*

To the extent that the majority suggests that a statutory classification may pass constitutional muster if it promotes *any* legitimate state purpose, related to the statute or not, I strongly disagree. Any such conclusion is entirely inconsistent with more than seventy-five years of this court's precedent and finds no other support in the case law.[5] Under such a standard, *any* legisla-

---

[5] The majority relies on this court's decision in *Daily* v. *New Britain Machine Co.*, supra, 200 Conn. 562, and *Blue Sky Bar, Inc.* v. *Stratford*, supra, 203 Conn. 14, in support of its contention that statutory classifications need not further the statute's *primary* purpose. As I have indicated, I have no quarrel with that conclusion. Those cases also clearly support a conclusion, however, that a statutory classification must be related to *some* statutory purpose. The issue in *Daily* was whether employees who were injured by

tive classification that exempts a particular class of persons from legislation would be constitutional, because the state *always* has a legitimate interest in relieving its citizens of the costs and burdens of state regulation. Although it is well established that courts must give great deference to legislative classifications, it has never been suggested that we should give *absolute*

a defective product in the course of their employment constitutionally were entitled to the same procedural rights under the product liability statute as nonemployees who were injured by a defective product. *Daily* v. *New Britain Machine Co.*, supra, 575–76. In determining that a ten year statute of repose should apply to employees, the legislature reasoned, in part, that even after the expiration of the statute of repose, the employees could receive prompt compensation for their injuries under the workers' compensation act, without any need to prove fault or liability. Id., 579. This court specifically concluded that the classification rested "upon a difference having a fair and substantial relation to the object of the legislation"; id.; which, presumably, was to provide fair, orderly and efficient procedures for persons who are injured by defective products to obtain compensation for their injuries.

In *Blue Sky Bar, Inc.* v. *Stratford*, supra, 203 Conn. 25–26, this court considered the constitutionality of an ordinance that prohibited vending from motor vehicles, but not from fixed locations or nonmotor vehicles. The purpose of the ordinance was to protect the safety of children and to encourage the free flow of traffic. Id., 24. This court specifically concluded that "the challenged classification is rationally related to the purpose of the ordinance"; id., 28; because the town reasonably could have concluded that vending from nonmotor vehicles had "less of an impact on the free flow of traffic and presents less of an overall safety hazard to children than vending from motor vehicles." Id., 29.

The United States Supreme Court's decisions in *Hodel* v. *Indiana*, 452 U.S. 314, 332–33, 101 S. Ct. 2376, 69 L. Ed. 2d 40 (1981), and *Federal Communications Commission* v. *Beach Communications, Inc.*, supra, 508 U.S. 313–14, also support a conclusion that statutory classifications must be related to a statutory purpose. The United States Supreme Court specifically found in those cases that the challenged statutory classifications were rationally related to the underlying purposes of the statutes. See *Hodel* v. *Indiana*, supra, 332–33 (statutory provision imposing more stringent restoration requirements for farmland mines than for steep slope mines was rationally related to purpose of preserving productive farmlands); *Federal Communications Commission* v. *Beach Communications, Inc.*, supra, 318–20 (statutory provision exempting buildings under common ownership or management from cable regulation was rationally related to purpose of promoting competition).

deference to the legislature. If, for example, the legislature had determined that, in order to reduce the burdens imposed by P.A. 03-45, cafés and restaurants located in towns whose names contain an even number of letters would be exempt from the statute, surely that arbitrary classification could not be saved by the fact that it promoted a legitimate public interest.

I would conclude that there is no relationship between the classification created by P.A. 03-45 and the purpose of the statute. Indeed, I would conclude that the public interests identified by the majority in support of its conclusion that such a relationship exists,[6] namely, protecting the purported privacy interests of private club members and avoiding a confrontation with the Indian tribes, are purely illusory.

With respect to the exemption for private clubs, the trial court relied solely on the legislative history of P.A. 03-45 in support of its conclusion that the exemption was constitutional. Representative Art Feltman argued in support of the exemption for private clubs that "we consider these establishments to be the extension of people's private homes. They're membership organizations, people have to pay dues to belong to them, they have fixed memberships, and it's as if these people were gathering in their living rooms. And so that's why we consider this part of the private domain, not the public domain. They are not open to the public." 46 H.R. Proc., Pt. 8, 2003 Sess., p. 2409. He also indicated that, "[t]he existing [private] clubs are not included in this bill. We

---

[6] As I have indicated, it is not entirely clear to me whether the majority concludes that there is a relationship between the classification and the purpose of P.A. 03-45 or that it is not required to identify any such relationship, as long as the classification promotes *some* public purpose. I would agree that relieving corporate citizens of the burdens of state regulation is a legitimate public purpose. I also cannot disagree with the tautology that exempting private clubs and casinos from P.A. 03-45 relieves them of the burdens imposed by the statute. As I have explained, however, I cannot agree that that purpose justifies the classification created by the statute.

consider them to be part of the private domain and what we're trying to regulate here is the public domain." Id., p. 2423. The trial court concluded that this classification was constitutional because "[p]rivate clubs and associations are frequently subject to different laws and legal requirements than public locations. The law recognizes that they can be regulated differently. The legislature's decision to exempt certain private clubs from the ban is a manifestation of this." In their brief to this court, the defendants[7] argue that the classification was justified because "members may have joined [private clubs] for a fee with the expectation that they could smoke . . . ."

In my view, the trial court, the defendants and the majority all have failed to articulate any "ground of difference *having a fair and substantial relation* to the object of [P.A. 03-45] . . . ." (Emphasis added; internal quotation marks omitted.) *Daily* v. *New Britain Machine Co.*, supra, 200 Conn. 578. Instead, they simply have begged the question by assuming that *any* difference between disparately treated classes justifies the disparate treatment. The defendants concede, and there is no dispute, that "the intent of [P.A. 03-45] was to protect employees, especially those with little choice as to where they work, from being subjected to [exposure to carcinogenic secondhand smoke] as a condition of their employment."[8] I cannot conceive of any rational relationship between this purpose and providing an

---

[7] The defendants are the commissioner of public health and the attorney general.

[8] The majority suggests that I, alone, have identified the protection of employees as the primary legislative purpose of P.A. 03-45. As I have indicated, however, the agency responsible for enforcing the law, the department of public health, and its legal representative, the attorney general, have identified the protection of employees as the law's primary purpose. If the majority believes that the defendants' understanding is incorrect, or that there are additional public purposes underlying the legislation, it should state the reasons for its belief and identify those purposes.

exemption for establishments that purportedly were founded with the expectation that smoking would continue to be permitted there. There is no evidence in the record that private clubs have fewer employees than the establishments that are subject to the act or that their employees are somehow less susceptible to the ill effects of secondhand smoke than other employees.

Moreover, there is absolutely no evidence in the record that the members of the private clubs formed or invested in the clubs with the expectation that smoking would be allowed there or, if they did, that any such expectation was reasonable. Representative Feltman stated only that private clubs were exempted because they were not in the "public domain," but were like private "living rooms." 46 H.R. Proc., supra, p. 2409. Although I recognize that this court gives deference to legislative fact-finding, I do not believe that we must defer to a finding that is contrary to all common sense and experience. Living rooms in private residences do not by their nature require the presence of full-time employees or have continually changing membership lists, and generally do not welcome a stream of "guests" who are unknown to most, if not all, of the household residents.[9] For these reasons, private living rooms, unlike private clubs, generally are not subject to workplace safety and other health and employment laws.[10] There simply is no basis for the conclusion that the members of private clubs had a reasonable expectation that they would be exempt from this particular law

---

[9] Indeed, notwithstanding the provisions of General Statutes § 30-23a; see footnote 11 of the majority opinion; it is a matter of common knowledge and experience that, in order to be served as a "guest" at a private club, a person need not be known personally by any member of the club.

[10] The trial court stated that "[p]rivate clubs and associations are frequently subject to different laws and legal requirements than public locations." It provided no examples of these different laws, however, and the state points to no such examples on appeal. Nor does my research reveal any instances in which private clubs are treated differently from other establishments under laws governing employment or workplace safety.

governing workplace safety, despite the fact that clubs generally are subject to the same laws as other employers.[11] See *Anchor Inn Seafood Restaurant* v. *Montgomery County*, Circuit Court for Montgomery County, Maryland, Docket No. 199692 (June 20, 2000) p. 11 (finding no rational basis for exempting clubs from smoking ban when clubs were subject to same health and safety regulations as nonexempt establishments), aff'd on other grounds, *Montgomery County* v. *Anchor Inn Seafood Restaurant*, 374 Md. 327, 822 A.2d 429 (2003).[12]

---

[11] The majority argues that statutory provisions provide a basis for the legislature's conclusion that private club members "possess an expectation of privacy and control over their club" because the statutes require the clubs to limit their service of alcohol to members and their invited guests only and to maintain and file with the state a current list of members. That argument is purely conclusory. My very point is that the fact that the members of a private club are statutorily entitled to choose and to limit the club's membership reasonably cannot give rise to a reasonable expectation that the club will be exempt from any particular law governing workplace health and safety. Indeed, the legislature itself implicitly acknowledged as much when it determined that clubs whose permits were issued after May 1, 2003, would be subject to the smoking ban. I have no doubt that many private club members would prefer that their clubs be exempt from any burdensome state regulation. I fail to see, however, how that bare preference can form a constitutional basis for a legislative classification.

The majority continues to beg the question when it argues that " '[i]t is not the function of the court to alter a legislative policy merely because it produces unfair results' "; *Ecker* v. *West Hartford*, supra, 205 Conn. 241; immediately after pointing out that " '[i]f the classification *has some reasonable basis*, it does not offend the [c]onstitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality.' " (Emphasis added.) *United States Railroad Retirement Board* v. *Fritz*, 449 U.S. 166, 175, 101 S. Ct. 453, 66 L. Ed. 2d 368 (1980). Again, my point is that an entity's unfounded expectation that it will be exempted from general public laws cannot form a reasonable basis for any legislative classification. The fact that this law is patently unfair to restaurant and café owners—a point with which the majority appears to agree—does not form the sole basis for my argument that it is unconstitutional.

[12] The majority states that the reasoning of the court in *Anchor Inn Seafood Restaurant* "is not relevant to our current inquiry because, under Connecticut law, a private club is not necessarily a nonprofit organization, and the smoking ban exemption for private clubs does not distinguish based on the clubs' status in this regard." As the majority acknowledges, however, in concluding that the exemption of nonprofit clubs from the smoking ban

The defendants have cited no authority for the proposition that unfounded expectations of privacy can form a constitutional basis for a legislative classification.

In any event, even if the members of private clubs have an investment backed expectation that the conditions under which they made their investment would continue, that does not distinguish them from the proprietors of the establishments that are subject to the smoking ban. Again, it is a matter of common sense and experience that many restaurants and cafés that are subject to the ban have built up regular clienteles over time, and those clienteles have certain expectations. If their expectations are thwarted by state regulation, the clienteles presumably will move on to unregulated venues where they can pursue their chosen activities unhampered. It is true that the clienteles will not suffer any loss of investment, but only because *the proprietors of the regulated establishments will bear the entire loss*. Thus, the difference between private clubs and nonexempt restaurants and cafés, in this context, is that, in private clubs, the loss of investment backed expectation for each individual member as a result of the smoking ban would be relatively small, but would be born by a relatively large number of individuals, while, in restaurants and cafés owned by a single individual, that single individual will bear the entire loss. It is beyond my comprehension why this

had no rational basis, the Maryland court reasoned that the fact that the clubs were nonprofit did not rationally distinguish them from the nonexempt establishments in this context because *nonprofit entities were subject to the same general health and safety regulations as for-profit entities.* Similarly, in the present case, the purported privacy expectations of the members of private clubs do not rationally distinguish private clubs from nonexempt establishments when those privacy expectations have not prevented private clubs from being subject to other generally applicable laws governing employment and workplace safety.

distinction constitutes a rational basis for exempting private clubs.[13]

The defendants argue that "it does not violate equal protection for a legislature to address a problem one step at a time . . . ." See *Justiana* v. *Niagara County Dept. of Health*, 45 F. Sup. 2d 236, 242 (W.D.N.Y. 1999) (upholding constitutionality of partial smoking ban on ground that "a legislature can address a perceived problem incrementally if in its judgment that is the best way to address the problem"), citing *Federal Communications Commission* v. *Beach Communications, Inc.*, supra, 508 U.S. 316 (legislature " 'may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind' "). As the defendants conceded at oral argument before this court, however, if a legislative classification is not rationally related to the purpose of the legislation in the first instance, a claim that the legislature has taken an incremental approach to a perceived problem will not save the classification. For example, if it would be unconstitutional for the legislature to address the problem of excessive speed on state highways by setting a speed limit of fifty-five for all vehicles except for sports cars in which the owner had an investment backed expectation in driving at a high rate of speed, the classification would not be saved by a claim that sports cars eventually could be subject to the prohibition. Because I see no rational basis for the exemption to the smoking

---

[13] It does suggest a *political* motivation for the exemption, however. As long as any individual who wants to smoke while he drinks can find an establishment where he is allowed to do so, the burden imposed by the smoking ban on such individuals will be relatively light. Because there presumably are many more such individuals than there are proprietors of establishments that are subject to the ban, exempting certain establishments allows the legislature to gratify the political proponents of the ban while insulating itself from political backlash from opponents. As I have indicated, a primary purpose of the equal protection clauses is to prevent such politically motivated classifications.

ban for private clubs, I would conclude that the state's "one step at a time" argument fails.

I also disagree with the majority's conclusion that there is a rational basis for exempting casinos from the smoking ban. The majority bases its conclusion on two premises: first, the majority claims that it is unclear whether the legislature has the power to impose the smoking ban on a tribal entity and, second, the majority concludes that "tribal sovereignty can complicate state efforts to impose regulation on the tribes, even when the state clearly holds the legal power to do so." Neither premise survives scrutiny.

On October 1, 2003, the attorney general rendered a written opinion in response to an inquiry by Senator Louis C. DeLuca as to whether P.A. 03-45 applies to the casinos. In that opinion, the attorney general indicated that under § 14 of the state's gaming compacts with the Indian tribes, " '[t]ribal ordinances and regulations governing health and safety standards applicable to the gaming facilities shall be no less rigorous than standards generally imposed by the laws and regulations of the [s]tate relating to public facilities with regard to building, sanitary, and health standards and fire safety.' " The attorney general stated that, although the phrase " 'health and safety standards' " was not specifically defined in the compacts, "by its terms, [it] applies broadly to include all of the [s]tate's health and safety laws. The smoking ban legislation involves an obvious and important health issue, and therefore, implicates application of [this provision]." The attorney general concluded, however, that, because the legislature had not included the special liquor permits for casinos in the list of permits covered by P.A. 03-45, the state had not banned smoking in the casinos and, accordingly, the compacts did not require the tribes to ban smoking in the casinos.

It is perfectly clear, therefore, that the legislature has the power to include casinos in the smoking ban.[14] Moreover, I am not persuaded by the defendants' argument that, because the attorney general did not render this opinion until after P.A. 03-45 had been enacted, the legislature could not have known that it had such power. Even if it were plausible that the legislature was not aware of the legal import of the gaming compacts, the defendants cite no authority for the proposition that the legislature's claimed ignorance of its own clear legal authority can form a constitutional basis for an otherwise unconstitutional classification.

Nor am I persuaded that the enforcement of the smoking ban in the casinos would be unduly complicated by the sovereign status of the tribes. The office of legislative research has indicated that, as of August 10, 2001, in order to enforce the provisions of the gaming compacts, the state had stationed at the two casinos thirteen liaison officers from the department of special revenue, nine liquor control agents and twenty-nine state police officers. Office of Legislative Research, Research Report, August 10, 2001, 2001-R-0635, p. 1. The office of legislative research also has indicated that "[t]he state assesses the tribes and the tribes reimburse it for all the direct and indirect costs associated with the casino-related functions the agencies provide." Id. There is absolutely no evidence in the record that the

---

[14] The majority, relying on *Rice* v. *Rehner*, 463 U.S. 713, 718–19, 103 S. Ct. 3291, 77 L. Ed. 2d 961 (1983), suggests that this power is not perfectly clear because a "sensitive and careful analysis [is] required to determine whether regulation of activities on tribal lands is permissible," and there has been no judicial determination on that issue. In *Rice*, however, the question was whether a particular state law unilaterally could be imposed on a tribal entity in light of general principles of tribal sovereignty and immunity. Id., 715. In the present case, the legislature was not confronted with that admittedly thorny issue. Rather, the question of whether it had authority to impose a smoking ban involved the construction of an agreement between the tribal entities and the state that was clear on its face.

tribes ever have interfered with these agents of the state or resisted in any way the enforcement of the provisions of the gaming compacts requiring the casinos to comply with state health and safety laws.

The fact that other Indian tribes have resisted different, and at least colorably illegal, state regulations governing activities that take place within tribal territories where agents of the state are barred from entering for purposes of law enforcement does not affect my conclusion. See *New York Assn. of Convenience Stores* v. *Urbach*, 275 App. Div. 2d 520, 522, 712 N.Y.S.2d 220 (2000) (state's decision not to enforce regulations governing sale of cigarettes on tribal land had rational basis because tribes refused to cooperate with state and enforcement was impossible without tribes' cooperation).[15] The record in the present case provides no support for a conclusion that enforcement of the smoking ban in the casinos would face insuperable, or even mildly challenging, legal or practical barriers.

The defendants finally argue that "the relationship between the state and the tribes is complicated by eco-

---

[15] The court in *New York Assn. of Convenience Stores* stated that "[t]he record here clearly reflects such a state of facts, as it makes plain that the statutes cannot effectively be enforced without the cooperation of the Indian tribes. Because of tribal immunity, the [tribal] retailers cannot be sued for their failure to collect the taxes in question, and [s]tate auditors cannot go on the reservations to examine the retailers' records.

"Additionally, the [d]epartment [of taxation and finance (department)] cannot compel the retailers to attend audits off the reservations or compel production of their books and records for the purpose of assessing taxes. In that regard, representatives of the [d]epartment engaged in extensive negotiations with the tribes in an effort to arrive at an acceptable agreement. Those efforts were largely unsuccessful and the vast majority of the Indian retailers refused to register with the [d]epartment. In further efforts to enforce the statute, the [s]tate attempted interdiction, i.e., interception of tobacco and motor fuel shipments and seizure of those shipments that were found to be in noncompliance with the [t]ax [l]aw. That strategy resulted in civil unrest, personal injuries and significant interference with public transportation on the [s]tate highways." *New York Assn. of Convenience Stores* v. *Urbach*, supra, 275 App. Div. 2d 522–23.

nomic and political concerns because the casinos contribute millions of dollars a year to the state's treasury."[16] They point out that the plaintiffs argued to the trial court that, " '[h]ad the smoking ban applied equally to bars and restaurants in clubs and casinos, neither the public act nor its sponsors would have survived the political fallout,' " and contend that, "[a]lthough there is no evidence that this concern was in fact the true basis for exempting casinos from the ban, it is clearly a conceivable, rational basis for the exemption." As I have indicated, far from being a rational basis for a legislative classification, legislative maneuvering to avoid the political fallout of imposing burdensome legislation on a politically powerful group is precisely what the equal protection clauses of the state and federal constitutions were designed to prevent. See *Wagner* v. *Connecticut Personnel Appeal Board*, supra, 170 Conn. 673.

In summary, to the extent that the legislative classification created by P.A. 03-45 can be explained at all, it can only be explained, on the one hand, by purely speculative or simply unsupportable legislative fact-finding, or, on the other hand, by entirely improper political considerations. I recognize that "[t]he burden is on the [party] attacking the legislative arrangement to negative every conceivable basis which might support it . . . ." (Internal quotation marks omitted.) *State* v. *Long*, 268 Conn. 508, 534, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004). I continue to believe, however, not just *any* conceivable distinction between disparately treated groups that can be articulated may serve as a constitutional basis for a legislative classification. Rather, the distinction must

---

[16] The record reflects that, from the 1992–1993 fiscal year through the 2000–2001 fiscal year, the tribes contributed approximately $1.8 billion to the state pursuant to agreements with the state governing revenue from slot machines. Office of Legislative Research, supra, p. 1.

be *rationally* related to a *legitimate* government purpose.[17] See *Daily* v. *New Britain Machine Co.*, supra, 200 Conn. 577. Sheer speculation and error are not rational, and selective avoidance of political fallout is not a legitimate legislative purpose. I would conclude that the exemption of private clubs and casinos from the scope of P.A. 03-45 violates the equal protections clauses of the federal and state constitutions. Accordingly, I dissent.

---

[17] The majority relies on *Coalition for Equal Rights, Inc.* v. *Owens*, 458 F. Sup. 2d 1251, 1256 (D. Colo. 2006), in support of its conclusion that P.A. 03-45 is constitutional. In that case, the United States District Court for the District of Colorado concluded that a smoking ban that exempted casinos did not violate the equal protection clause. Id., 1261. In reaching that conclusion, the court expressly rejected the plaintiffs' argument that a legislative classification must be substantially related to the purpose of the legislation. Id., 1259–60. The court determined that the party challenging the constitutionality of a classification must show that it is "irrational and *completely* unrelated to *any conceivable* policy goal." (Emphasis added.) Id., 1260. As I have indicated, up to now this court consistently, and in my view, correctly, has held that, to pass constitutional muster, legislative classifications must be rationally and substantially related to the purpose of the legislation.

As I have indicated, the legislature may, of course, address the worst aspects of a particular problem first. It is possible, for example, that the legislature could ban smoking in all elementary schools but not in colleges and universities on the ground that exposure to secondhand smoke is more dangerous to children than to adults. There is no suggestion in the present case, however, that the exemption of private clubs and casinos has any such purpose or effect.